Frances TAYLOR, complainant,
Respondent,

v.

BELTRAMI ELECTRIC COOPERATIVE, INC., Appellant,

Minnesota Public Utilities Commission,
Respondent.

No. 81–931.

Supreme Court of Minnesota.

May 14, 1982.

McRae & McRae and Sheldon D. McRae, Jr., Bemidji, for appellant.

Neil R. Tangen, Anishinabe Legal Services, Cass Lake, for Taylor.

Warren Spannaus, Atty. Gen., Jean E. Heilman, Asst. Atty. Gen., and Kenneth A. Nickolai, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Public Utilities Comn.

SCOTT, Justice.

Frances Taylor, complainant-respondent, filed a complaint with the Minnesota Public Utilities Commission (Commission) alleging that a construction deposit policy of Beltrami Electric Cooperative, Inc., (Beltrami Electric), appellant, was discriminatory. The Commission revoked the policy as unreasonably discriminatory and permitted Beltrami Electric to file with the Commission within 90 days a proposal for a new policy with supporting data. Beltrami Electric, contesting the jurisdiction of the Commission and asserting that its policy was reasonable and not discriminatory, appealed to the district court, which affirmed. We affirm.

Complainant instituted this proceeding by a formal complaint when Beltrami Electric charged her a substantially higher construction deposit for installation of mobile home electrical service than would be charged for conventional foundation home service. Fifty other consumers also filed a complaint. On its own motion, under authority of Minn.Stat. § 216B.17 (1980), the Commission scheduled an evidentiary hearing.

Evidence received by the hearing examiner revealed that Frances Taylor leased a tract of land from the Minnesota Chippewa Tribe in 1979 under a 25-year renewable lease and moved a mobile home onto the property. The site was within appellant Beltrami Electric's service area, and complainant requested a service connection from Beltrami Electric, a cooperative electric association organized under the provisions of Minnesota Statutes, Chapter 308.

Beltrami Electric's policy concerning construction of line extensions to mobile homes is contained in Policy Bulletin No. 33. Under this policy mobile homes will be provided with electric service without a deposit for construction costs only when the location is within 200 feet of an existing transformer installation. When mobile homes require installation of transformer and service or construction of a line in excess of 200 feet, Beltrami Electric requires a deposit of $1.50 per foot for the entire distance, an amount less than actual construction costs. The deposit is refunded to the customer without interest at the rate of 10% per year. If service is disconnected before ten years, the remainder of the deposit is forfeited. Under this policy, complainant was required to pay a deposit of $570, computed upon the basis of a distance of 380 feet at $1.50 per foot, before service would be connected.

Beltrami Electric follows a different policy for deposits on service to a conventional

house. No deposit is required for conventional homes located within 1320 feet (¼ mile) of the connection point. Any installation requiring line extension in excess of 1320 feet requires a deposit of $.50 per foot, but only for the distance in excess of 1320 feet.

Representatives of Beltrami Electric testified that Policy No. 33 was adopted in 1977 because of concern about a high turnover in mobile home service. Frequently Beltrami Electric would extend the line and then a few months later the mobile home would be gone. The policy was adopted to protect the interests of other consumers who remained for longer periods of time. Under the policy, mobile home owners who require line extensions bear more responsibility for the costs involved in extending the line. Before 1977, no distinction was made between mobile homes and conventional homes unless service was temporary.

Beltrami Electric attempted to justify its policy by introducing into evidence records of service installations and numbers of idle service connections. Those records indicated that 10.4% of all services in place were idle in April 1971; 10% were idle in March 1977; and 11.6% were idle in September 1979. Since 1971, records have been kept which identify mobile home installations. From 1971 until 1977, when Policy No. 33 was adopted, 900 services to mobile homes were built, and in November 1979, 225 of them were idle, which is 25% of those built during that period. On those 900 services, there were 1743 different customers from 1971 to 1977. After adoption of the policy, from 1977 to 1979, 315 mobile home services were built of which 30 or 9.5% were idle in November 1979. Those 315 services had served a total of 370 customers. In the years 1977, 1978, and 1979, the numbers of construction deposits paid in connection with service to mobile homes were six, seven, and six, respectively, ranging in amount from $135 to $1125.

Beltrami Electric contends that a construction deposit is a "rate" which is not subject to regulation by the Public Utilities Commission. The hearing examiner concluded to the contrary, however, that requiring a construction deposit before providing service is a "service standard and practice" and that the Commission had jurisdiction under Minn.Stat. § 216B.17, subd. 6a (1980) to adjudicate the complaint. The examiner also found that Beltrami Electric had failed to establish that its policy was reasonable.

The Commission heard oral arguments and on December 24, 1980, issued its order agreeing with the conclusions of the hearing examiner that the Commission had jurisdiction and that the policy was unreasonably discriminatory. The Commission concluded that there was no justification shown for "the longer non-charged extension length, for the difference in per foot charge, or for the distinction in calculating how many feet of a chargeable extension will be included in the deposit calculation." The Commission recognized that there may be some difference between establishing service for the two classes of customers, but was not persuaded that sufficient difference was shown to justify the discriminatory policy. The Commission pointed out that the reuse of mobile home connections was apparently not considered by Beltrami Electric in setting its policy.

Beltrami Electric appealed to the District Court for the Ninth Judicial District. A three-judge panel heard oral arguments and affirmed the order of the Commission by order dated July 27, 1981, from which this appeal is taken.

The two issues before this court are whether the Commission has jurisdiction to hear the complaint and, if so, whether there is substantial evidence in the record to support the decision of the Commission.

█ 1. The Public Utilities Commission does not have broad regulatory authority over electric cooperatives under the existing statutes, but it does have authority to resolve certain types of disputes involving cooperatives. The Commission's authority in this situation is found in section 216B.17:

On its own motion or upon a complaint made against any public utility, by the

governing body of any political subdivision, by another public utility, by the department, or by any 50 consumers of the particular utility that any of the rates, tolls, tariffs, charges, or schedules or any joint rate or any regulation, measurement, practice, act or omission affecting or relating to the production, transmission, delivery or furnishing of natural gas or electricity or any service in connection therewith is in any respect unreasonable, insufficient or unjustly discriminatory, or that any service is inadequate or cannot be obtained, the commission shall proceed, with notice, to make such investigation as it may deem necessary.

Minn.Stat. § 216B.17, subd. 1 (1980).

Subdivision 6a limits the authority over cooperatives:

For the purposes of this section, public utility shall include cooperative electric associations with respect to service standards and practices only.

Minn.Stat. § 216B.17, subd. 6a (1980). The issue is whether "service standards and practices" includes Beltrami Electric's policy requiring mobile home owners to pay a higher deposit than conventional home owners must pay to obtain electric service.

As Chapter 216B was originally enacted in 1974, cooperatives were included in the public utilities over which the Public Utilities Commission had broad regulatory power. In 1978, however, the legislature removed cooperatives from rate regulation by the Commission.[1] The Minnesota Public Utilities Act now contains the following legislative finding:

Because * * * cooperative electric associations are presently effectively regulated and controlled by the membership under the provisions of chapter 308, it is deemed unnecessary to subject such utilities to regulation under this chapter except as specifically provided herein.

Minn.Stat. § 216B.01 (1980). One aspect of regulation "specifically provided" is subdivision 6a of section 216B.17, which was added in 1978 to retain authority over cooperatives "with respect to service standards and practices only."

Beltrami Electric contends that its requirement of a refundable deposit is a "rate" rather than a "service standard and practice" and therefore is not subject to regulation or within the jurisdiction of the Commission. "Rate" and "service" are defined in section 216B.02 as follows:

Subd. 5. "Rate" means every compensation, charge, fare, toll, tariff, rental and classification, or any of them, demanded, observed, charged, or collected by any public utility for any service and any rules, regulations, practices, or contracts affecting any such compensation, charge, fare, toll, rental, tariff, or classification.

Subd. 6. "Service" means natural, manufactured or mixed gas and electricity; the installation, removal, or repair of equipment or facilities for delivering or measuring such gas and electricity.

Minn.Stat. § 216B.02, subds. 5, 6 (1980).

Installation of facilities for delivering electricity is within the above statutory definition of "service." The Commission was correct in concluding that the requirement of a deposit is a "service standard and practice," while the actual amount is a "rate." Their conclusion, therefore, correctly reflects the legislative intent.

The legislative history indicates that the 1978 amendments were intended to reduce unnecessary bureaucracy in rate-setting by cooperatives.[2] The statutory scheme is designed to exempt from state regulation those activities of a cooperative which the members can control by themselves. A cooperative need not be subject to the Commission in setting rates because the membership through its voting power can effectively review and modify the proposal and because the members of the cooperative are the ultimate recipients of any profit made. But this rationale for deregulating coopera-

---

1. Act of April 7, 1978, ch. 795, 1978 Minn.Laws 1220.

2. Debate on H.F.No.830, 70th Minn.Legis., 1978 Sess. (Jan. 26, 1978) (tape recording on file at the Minnesota House of Representatives Archives).

tives does not apply to the situation before us. A statutory provision enacted to. reduce unnecessary bureaucracy in rate-setting does not remove from the Commission the authority to prohibit arbitrary and discriminatory barriers to the provision of service.

The conclusion that Beltrami Electric's line extension and connection policy is within the jurisdiction of the Commission is further supported by the cases which hold that electric cooperatives have an obligation to render nondiscriminatory service. In *Dairyland Power Cooperative v. Brennan,* 248 Minn. 556, 564–65, 82 N.W.2d 56, 62 (1957), the court used the following language:

> Implicit in the purpose for which cooperatives are authorized by the Act [Rural Electrification Act of 1936], that "of supplying electric energy and promoting and extending the use thereof in rural areas," is the obligation of such corporations to make membership available, without arbitrary or unreasonable limitations thereon, to all coming within the purview of that purpose.

(quoting *Bookhart v. Central Electric Power Cooperative,* 219 S.C. 414, 422, 65 S.E.2d 781, 784 (1951).

The requirement of a construction deposit before service is connected does tend to limit the number of those applying for electrical connection. By retaining Public Utilities Commission jurisdiction over the service standards and practices of electric cooperatives, the legislature has assured members and potential members of an administrative remedy to protect those rights which the cooperative has no authority to limit or qualify. Therefore, even allowing for emphasis and careful consideration of the declared policy of the legislature of usually excluding electrical cooperatives from regulation, a practice of requiring construction deposits which are claimed to be discriminatory must be within the jurisdiction of the Public Utilities Commission.[3]

**2.** Beltrami Electric also contends that complainant failed to meet her burden of proving that Policy No. 33 was unreasonably discriminatory. In making its determination of unreasonableness, the Commission, as the finder of fact, acted in a quasi-judicial capacity and therefore will be held to the substantial-evidence standard on review. *See St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission,* 312 Minn. 250, 259–60, 251 N.W.2d 350, 356 (1977). The agency decision may be reversed or modified if it is "unsupported by substantial evidence in view of the entire record as submitted." Minn.Stat. § 15.0425(e) (1980).

In *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn.1977), the court approved the following definition of substantial evidence:

> We view that by the "substantial evidence" test is meant: 1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than "some evidence"; 4) more than "any evidence"; and 5) evidence considered in its entirety. There are correlative rules or principles that must be recognized by a reviewing court, such as: 1) unless manifestly unjust, inferences must be accepted even though it may appear that contrary inferences would be better supported; 2) a substantial judicial deference to the fact-finding processes of the administrative agency; and 3) the burden is upon the appellant to establish that the findings of the agency are not supported by the evidence in the record, considered in its entirety.

Beltrami Electric contends that there is not substantial evidence in the record to support the conclusion of the Commission. There is evidence in the record showing that mobile home owners were required to provide a construction deposit three times

---

**3.** Beltrami Electric also contends that even if the Commission does have jurisdiction under section 216B.17, the Commission has power only to investigate and not to adjudicate. This contention is refuted by section 216B.62, which gives the Commission authority to charge cooperative electric associations for "costs incurred in the *adjudication* of complaints over service standards and practices." Minn.Stat. § 216B.62, subd. 5 (1980) (emphasis added).

that required of conventional home owners and were allowed less than one-sixth the length of free line extension before making a deposit. In an attempt to justify this discrimination, Beltrami Electric presented evidence of idle rates and turnover rates. Beltrami Electric contends its difference in deposits is justified since mobile home owners and conventional home owners are not "similarly circumstanced with reference to its system." *Mason v. Consumers Power Co.*, 119 Minn. 225, 228, 137 N.W. 1104, 1105 (1912). The Commission determined that there were other factors, including the reuse of the connections and the salvage value of the line extensions, which had not been considered by Beltrami Electric.

Giving proper deference to the expertise of the Commission, *see Reserve Mining Co. v. Herbst*, 256 N.W.2d at 824–25, we find that its conclusion that the policy is discriminatory and unreasonable is supported by substantial evidence. We note that the Commission did not prohibit all distinctions between mobile homes and conventional foundation homes. The terms of the order permit Beltrami Electric, if it wishes, to file with the Commission for its review and approval a new proposal for determining the amount of construction deposit to be required of different classes of new residential customers, together with the supporting data for that proposal. But the substantial disparity between the treatments of the two classes of customers under the present policy has not been shown to be reasonable. The decisions of the district court and the Public Utilities Commission must be affirmed.

Affirmed.