In the Matter of the Joint Petition of SPACE CENTER TRANSPORT (aka Wintz Freight Systems, Inc., a wholly owned subsidiary of Space Center, Inc.), 444 Pine St., St. Paul, MN 55101 (Transferor) and Wintz Freight Systems, Inc. (a wholly owned subsidiary of DGT Properties, Inc.) (sole officer, director and shareholder is Thomas G. Wintz), 1145 Homer St., St. Paul, MN 55116 (Transferee), for an Order Authorizing and Approving the Transfer of Irregular Route Common Carrier Authority held by the Transferor to Transferee.

No. C6–89–662.

Court of Appeals of Minnesota.

Aug. 22, 1989.

Review Dismissed Oct. 19, 1989.

Hubert H. Humphrey, III, Atty. Gen., Jon Erik Kingstad, Sp. Asst. Atty. Gen., St. Paul, for respondent MTRB.

Corey J. Ayling, O'Connor & Hannan, Minneapolis, for relators.

Heard, considered and decided by PARKER, P.J., and KALITOWSKI and IRVINE,* JJ.

## OPINION

PARKER, Judge.

Relators Wintz Freight Systems (WFS), DGT Properties, Inc. (DGT), and their owners seek review by writ of certiorari from two orders of the MTRB. On January 26, 1989, the MTRB adopted the findings of the administrative law judge (ALJ) and concluded that DGT did not comply with Minn. Stat. § 221.151, subd. 1 (1988), and therefore was prohibited from receiving an irregular route common carrier (IRCC) permit. On March 15, 1989, the MTRB denied

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

relators' petition for reconsideration and rejected their plan of divestiture. We affirm.

## FACTS

George Wintz Jr. is a successful trucking entrepreneur who currently owns at least six trucking-related companies. His companies hold local cartage, charter, contract carrier and interstate permits. On May 19, 1986, he formed DGT Properties, Inc.; George Wintz was DGT's sole shareholder and director and its first president. DGT purchased a truck terminal on Territorial Road in St. Paul for $500,000. The purchase was financed with a $650,000 loan personally guaranteed by him. The remainder of the loan money went into a DGT checking account.

In May and June 1986 George Wintz negotiated with Space Center, Inc., for DGT to purchase its transportation subsidiaries. Space Center then owned both Space Center Transport, Inc., which held local cartage carrier (LCC) and IRCC permits, and Sterling Cartage Company, which had a courier services carrier permit. George testified that he purchased the carrier companies to establish his son Thomas as the owner of a small transportation company of his own. At the time, Thomas was 20 years old and a full-time college student due to graduate in May 1988. Because the parties had agreed that the purchaser would not use the Space Center name and logo, Space Center Transport changed its name to Wintz Freight Systems, Inc. (WFS).

In May 1987, just prior to DGT's purchase of Space Center's transportation subsidiaries, Thomas purchased 100 percent of DGT stock from George for a $40,000 promissory note. Shortly thereafter, the DGT purchase of WFS stock took place. Despite Thomas' ownership of 100 percent of the DGT stock, George handled all the negotiations, including execution of the documents. Thomas did not participate. DGT paid Space Center $370,000 in cash and transferred the Territorial Road terminal free and clear of any outstanding obligations. George arranged for DGT to bor-row the $370,000 cash through a loan secured by the equipment of one of his trucking companies, Wintz Truck Leasing (WTL), and by his personal guarantee. In order to pay off the mortgage to the terminal and provide operating funds, WTL loaned DGT $1.4 million. George signed the note on behalf of DGT.

WTL then acquired all of the rolling stock of WFS except 20–25 tractors and assumed $3 million of the annual traffic previously serviced by Space Center. WFS retained approximately $1.4 million of traffic, while the remaining $1.6 million was assumed by other carriers. The rolling stock sale to WTL was part of the $1.4 million loan agreement. DGT agreed to pay interest on the loan, but at the time of the hearing in May 1988 it had made no payments to WTL. Thomas testified that his accountants had not yet determined the exact amount of the outstanding debt on the loan.

Toward the end of the 15–hour closing, George signed a thick stack of papers, including a document identifying him as sole shareholder and director of DGT. He subsequently submitted an affidavit asserting that the document had been mistakenly executed and that on the date of the closing, Thomas was the sole shareholder of DGT.

On July 15, 1987, George resigned as president of DGT, and the following day Thomas was elected to the position. In an agreement signed by Thomas, as president, George contracted to provide management consulting services for a percentage of gross revenues regardless of profitability.

After Thomas' assumption of the presidency, little changed in DGT's operations. Thomas was characterized by the ALJ as "the vice president in charge of operations" for DGT and George as "the chief executive officer." George signed all DGT checks, several in significant amounts. In its first year of operation, DGT's checking account balance dropped from almost $300,000 to about $3,000. In all, George made inter-company transfers out of DGT totaling $400,700 to himself or to his other interests. Approximately $190,000 was

transferred into DGT's account from George and his interests. George and Thomas testified that the transfers were loans or investments. No payments on debt or interest were made in 1986–87, however, and there was no documentation presented of any investments on DGT's behalf.

Thomas' testimony reflected a lack of any specific knowledge of the transfers, although he testified that he was planning to take over control of the DGT checkbook in the summer of 1988. Thomas, however, handled the WFS checkbook and day-to-day operations. He supervised the WFS drivers and handled payroll, customer relations, and maintenance schedules.

The record reflects that WFS is housed rent-free at the WTL facility. One of George's companies provides clerical and administrative services free of charge. WTL performs maintenance on WFS rolling stock for a fee. Another George Wintz enterprise pays WFS $20,000 per month for the lease of five WFS trucks and the services of WFS drivers and tractors to shuttle its trailers.

The Space Center stock transfer to DGT was reported to the Department of Transportation. Subsequently, the parties to the sale filed a joint petition for transfer of IRCC permit authority pursuant to Minn. Stat. § 221.151. The petition indicated that Thomas was the sole officer, director and shareholder of WFS, the transferee, and that he held LCC and CHTR authority but no other permits.

The parties appeared at a two-day hearing before the ALJ, who then issued recommendations to the MTRB. The ALJ concluded that because the sale of the stock interest in WFS accomplished a material change in ownership, the company is required to comply with Minn.Stat. § 221.151. Concluding that George Wintz "effectively controlled" DGT, which purchased WFS while George held permits through WTL, the ALJ recommended that the IRCC permit be denied. In the alternative, he recommended that it be granted "SUBJECT TO such conditions as the Board may prescribe to ensure that the operations of DGT

Properties, Wintz Freight Systems and Sterling Cartage are separated from those of George L. Wintz, Jr. within a reasonable period of time."

Wintz filed exceptions to the ALJ report. The MTRB adopted the ALJ's findings with some modifications. A signal addition was a finding of subterfuge on George Wintz's part. The MTRB found that George exercised control over the corporations as part of a plan to acquire an additional motor carrier permit. The MTRB made the additional finding that any permit would be limited geographically.

The MTRB affirmed the ALJ's use of the "effective control" test for authorizing transfers of permits. It concluded that the transfer must be denied because it would enable George Wintz to control three permits and that the only remedy would be for him to divest all control over WFS' IRCC permit. The MTRB stated that it would consider a plan of divestiture submitted within 30 days.

George Wintz submitted a plan and a petition for reconsideration of the Order After Exceptions. The MTRB held a hearing on February 22, 1989, at which the Wintzes' counsel appeared. When MTRB members indicated that they were inclined to reject the divestiture plan as submitted, counsel stated that his clients were willing to go along with any plan the MTRB ordered if that was the price Thomas had to pay to pursue his chosen career.

On March 15, 1989, the MTRB denied reconsideration and rejected the plan of divestiture. It found that the Wintzes had not proved that George did not control the permit. It withdrew its finding of subterfuge, however, stating:

A finding of fraud, deceit or subterfuge is not necessary to support the Board's order and it is not clear from the record that George Wintz, Jr. did not merely act in good faith to set up his son into business, albeit in an unlawful manner.

Rejecting the plan of divestiture, the MTRB concluded that the plan only purports to eliminate the formal indicia of ownership and not the real mechanisms of control.

Wintz petitioned for a writ of certiorari from this court, which was granted on April 13, 1989.

## ISSUES

1. Did the MTRB err in concluding that George Wintz Jr. effectively controlled the permit at issue?

2. Did the MTRB act arbitrarily and capriciously in refusing to consider total divestiture as a cure so that Thomas Wintz could obtain the permit?

## DISCUSSION

■ Decisions of administrative agencies enjoy a presumption of correctness, and courts must show deference to the agency's expertise and special knowledge in its field of technical training, education and experience. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977). In reviewing agency decisions, this court is governed by the Minnesota Administrative Procedures Act. Minn.Stat. § 14.69 (1988) provides:

> In a judicial review under sections 14.63 to 14.68, the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
>
> (a) In violation of constitutional provisions; or
>
> (b) In excess of the statutory authority or jurisdiction of the agency; or
>
> (c) Made upon unlawful procedure; or
>
> (d) Affected by other error of law; or
>
> (e) Unsupported by substantial evidence in view of the entire record as submitted; or
>
> (f) Arbitrary or capricious.

The party seeking review of the agency action has the burden of proving that the agency's conclusions violate one or more of the provisions of section 14.69. *Markwardt v. Water Resources Board,* 254 N.W.2d 371, 374 (Minn.1977) (referring to section 15.0425, which has been renumbered section 14.69).

## I

■ The ALJ and the MTRB determined that despite Thomas Wintz's ownership of the DGT stock, his father effectively controlled the company. Because George Wintz already owned a permit through his other trucking concerns, he could not receive a permit through transfer under Minn.Stat. § 221.151, subd. 1 (1988). The relators challenge this decision, arguing that the MTRB exceeded its statutory mandate in reviewing the management of DGT and WFS rather than the ownership which clearly rested in Thomas. Specifically, they argue that the MTRB erred in applying an "effective control" test rather than the "corporate veil" test in determining whether DGT possessed another permit. We do not agree.

On matters of statutory interpretation, an appellate court is not bound by the determination of an administrative agency. The agency interpretation may be entitled to some weight, however, when the statutory language is technical and the agency's interpretation is one of long-standing application. *Arvig Telephone Co. v. Northwestern Bell Telephone Co.,* 270 N.W.2d 111, 114 (Minn.1978); *see also Petition of Fritz Trucking, Inc.,* 407 N.W.2d 447, 450 (Minn. Ct.App.1987), *pet. for rev. denied* (Minn. July 31, 1987).

Minn.Stat. § 221.151, subd. 1 (1986), provides that the MTRB may grant the transfer of a permit

> [i]f it appears to the board * * * that the approval of the sale or lease of the permit will not adversely affect the rights of the users of the service and will not have an adverse effect upon other competing carriers * * *. *Provided, however, that the board shall make no order granting the sale or lease of a permit to a person or corporation or association which holds a certificate or permit* other than local cartage carrier permit from the board under this chapter or to a common carrier by rail.

(Emphasis added).

This court has interpreted section 221.-151 such that

the Transportation Regulation Board may prevent the transfer of a common carrier permit to a corporation which is owned or *effectively controlled,* by an individual or corporation with a pre-existing interest in another common carrier permit.

*Petition of Fritz Trucking, Inc.,* 407 N.W.2d 447, 451–52 (Minn.Ct.App.1987) (emphasis added). In *Fritz* the MTRB had attributed a permit to the shareholders of the transferee corporation rather than to the corporation itself by reading subdivision 2 into subdivision 1. Subdivision 2 allows transfers of permits between immediate family members to be done informally without a hearing. It prevents a family member from receiving a permit if he or she

holds any other permit or certificate under this chapter either as an individual or in partnership or as owner of an interest in a corporation holding a permit or a certificate under this chapter.

Minn.Stat. § 221.151, subd. 2 (1986). The statute carries an express limitation of one permit to one person or one corporation. *Fritz,* 407 N.W.2d at 450. Recognizing that "the control of more than one permit could lead to control of prices, quantity or quality of service, or the nature of the competition between the remaining permit holders," the court found that the MTRB "correctly ignored form and concentrated on substance by focusing on the individuals who effectively control permits." *Id.*

While *Fritz* deals with shareholder involvement as opposed to managerial control, the policies behind the effective control test apply to the Wintzes. Thomas Wintz was the record owner of DGT and WFS and the sole officer and director. At the time of the hearing, however, he had no control or understanding of DGT's financial operations, and large sums of money had passed between that company and his father's other interests. Thomas' father provided the capital, expertise and entrepreneurship necessary to set his son up in business. At the time of the hearing before the ALJ, George completely controlled the financial operations of DGT, the company which owned WFS. If we were to ig-nore this control, we would allow George Wintz Jr. to circumvent the statute and control two permits. This control, in turn, could adversely affect the nature of the competition in the transportation business.

The statutory scheme of carrier regulation in this state contemplates that companies seeking carrier permits will file a petition under Minn.Stat. § 221.121 (1988). Unlike section 221.151, this section does not expressly preclude a person from owning multiple permits. Rather, it provides that the MTRB shall issue the permit if it finds that the petitioner is fit and meets the relevant safety standards, that there is a need for the services in the area, and that existing carriers have failed to demonstrate that they can meet the need. Minn.Stat. § 221.121, subd. 1 (1988). Because of these required showings, all competitors in the state are on notice of the possible issuance of a competing permit. Thomas, or even George, representing DGT and WFS, could have petitioned for the necessary permit through section 221.121.

The MTRB's conclusions that George controlled DGT are supported by substantial evidence and are neither arbitrary nor capricious. In reviewing findings of an agency, the substantial evidence test is applied. *Appeal of Signal Delivery Service,* 288 N.W.2d 707, 710 (Minn.1980). The substantial evidence test means:

1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than 'some evidence'; 4) more than 'any evidence'; and 5) evidence considered in its entirety. There are correlative rules or principles that must be recognized by a reviewing court, such as: 1) unless manifestly unjust, inferences must be accepted even though it may appear that contrary inferences would be better supported; 2) a substantial judicial deference to the fact-finding processes of the administrative agency; and 3) the burden is upon the appellant to establish that the findings of the agency are not supported by the evi-

dence in the record, considered in its entirety.

*Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn.1977) (as quoted in *Taylor v. Beltrami Electric Co-operative, Inc.,* 319 N.W.2d 52, 56 (Minn.1982)). A separate ground for rejecting agency findings is that they are arbitrary and capricious. An agency finding is arbitrary and capricious if the determination represents the agency's will and not its judgment. *Markwardt v. Water Resources Board,* 254 N.W.2d 371, 374 (Minn.1977).

The relators have not met their burden of proving that the MTRB's conclusions are unsupported by substantial evidence or are arbitrary and capricious. The ALJ heard two full days of testimony and made 69 findings, 17 of which specifically dealt with indicia of George's control of DGT. The MTRB then carefully considered each of the Wintzes' exceptions to the ALJ's report and wrote its own report with 21 findings. The MTRB minimally modified the ALJ's findings to reflect more closely the evidence. The record contains more than enough evidence to support the MTRB's conclusions and to indicate that the order reflects its careful judgment rather than its will.

We hold, therefore, that the MTRB did not err in denying the transfer of the IRCC permit to Thomas Wintz and WFS when the evidence showed that George Wintz effectively controlled the company.

## II

The Wintzes also argue that the MTRB arbitrarily and capriciously refused to consider divestiture as a cure for the violations so that Thomas could receive the permit at issue. An agency ruling will be deemed arbitrary and capricious if the agency relied on factors which the legislature had not intended it to consider, if it entirely failed to consider an important aspect of the problem, if it offered an explanation for the decision that runs counter to the evidence, or if the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Manufacturers Association*

*v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The reviewing court may not supply a reasoned basis for the agency's action that the agency has not given, but must uphold a decision of less than ideal clarity if the agency's path is reasonably discernible. *Id.*

An agency, however, is a creature of statute and possesses only those powers given to it by the legislature. *Peoples Natural Gas Co. v. Minnesota Public Utilities Commission,* 369 N.W.2d 530, 534 (1985). While express statutory authority need not be given a cramped reading, any enlargement of express powers by implication must be fairly drawn and fairly evident from the agency objectives and powers given by the legislature. *Id.; see also Petition of De Laria Transport, Inc.,* 427 N.W.2d 745, 748 (Minn.Ct.App.1988).

■ The MTRB's authority derives from Minn.Stat. ch. 221 (1986). Under section 221.151, "the board *shall make no order* granting the sale or lease of a permit to a person or corporation or association which holds a certificate or permit." Minn.Stat. § 221.151, subd. 1 (1986) (emphasis added). The statute does not require that the MTRB accept, or even consider, a plan of divestiture. Nonetheless, DGT and WFS were allowed to submit a plan of divestiture that would result in a company that met regulatory requirements.

■ As part of the plan submitted, George terminated his consulting relationship with DGT, submitted a cancelled stock certificate of his shares in DGT, and stated in an affidavit that as of January 26, 1989, he owned no interest in nor had any business relationship with DGT, WFS or any other entity owned by his son Thomas. Furthermore, he asserted he had no control over any of DGT's financial records. Thomas submitted an affidavit indicating that his father no longer had any interest in or business relationship with his companies. The plan of divestiture also included an office lease whereby WFS agreed to pay $500 per month to Wintz Companies, a maintenance contract between WFS and Wintz Companies for repairs pursuant to

estimates and approved work orders, and an agreement under which Wintz Companies could lease, for fair market value, WFS drivers and equipment as needed.

The MTRB entertained the plan, but found it insufficient. It concluded that the plan did not truly eliminate the real mechanisms of control, but formalized what had previously been informal relationships between WFS and other George Wintz companies. The Board found that

> [t]he "Equipment and Driver Lease" * * * provides for the availability of Wintz Freight Systems Trucks and drivers on a floating, open ended and "as needed" basis to the Wintz Companies. Compensation is not set forth in the contract nor is the duration of the lease. Possession, control and use of the vehicles listed * * * does not remain with Wintz Freight Systems but with Wintz Companies and George Wintz, Jr.

The MTRB's decision to reject the plan as representing form and not substance, without more, is clearly within its statutory authority. We are not in a position to hold the action arbitrary and capricious.

Because we do not remand for reconsideration, we need not consider the relators' additional issue of the geographical limitation on the IRCC permit.

### DECISION

The MTRB's denial of the IRCC permit is affirmed. The Board did not err in rejecting the plan of divestiture as submitted.

Affirmed.