In the Matter of the Petition of NORTH-
ERN STATES POWER GAS UTILITY
for Authority to Change its Schedule of
Gas Rates for Retail Customers Within
the State of Minnesota. (C5–94–201)

In the Matter of the Application of
NORTHERN STATES POWER COM-
PANY for Authority to Increase its
Rates for Electric Service in the State of
Minnesota. (C7–94–202)

Nos. C5–94–201, C7–94–202.

Court of Appeals of Minnesota.

Aug. 2, 1994.

Gary R. Cunningham, Asst. Atty. Gen., St. Paul, for Hubert H. Humphrey, III.

Scott Wilensky, Asst. Atty. Gen., St. Paul, for MN Dept. of Public Service.

James J. Bertrand, Minneapolis, for MN Energy Consumers.

Katherine L. McGill, Asst. Atty. Gen., St. Paul, for MN Public Utilities Com'n.

David A. Lawrence, Audrey Zibelman, and Samuel H. Hanson, Minneapolis, for Northern States Power Co.

## OPINION

HAROLD W. SCHULTZ, Judge.[*]

Relators the Minnesota Attorney General (the AG), the Minnesota Department of Public Service (the Department), and the Minnesota Energy Consumers (the MEC) challenge the Minnesota Public Utilities Commission's (the Commission's) order after reconsideration authorizing Northern States Power Company (NSP) stockholders to receive 11.47% return on equity on gas and electric rates instead of 11% as recommended by the administrative law judge (ALJ) and originally ordered by the Commission.

Relators contend that the discounted cash flow method using five- and ten-year historic models is the proper method to determine growth rate, rather than the historic ten-year model advanced by NSP and adopted by the Commission. Relators also argue that the Commission's order after reconsideration is arbitrary and capricious, and not based on substantial evidence.

## FACTS

On November 2, 1992, NSP filed a petition with the Commission seeking an increase in gas and electric rates. Although the gas and electric rate cases were separate, they eventually were combined so that evidentiary hearings on common issues could be held in April 1993.

In their original recommendation, the Department, the AG, and the MEC all used a discounted cash flow method (DCF) to determine the proper return on equity (ROE). In the DCF model, return on equity equals the dividend yield plus the growth rate. The growth rate is meant to reflect investor expectations.

All witnesses used 1981–1991 as the ten-year model and 1987–1991 as the five-year model. In 1990, the growth rate was abnormally low because the Commission denied NSP's requested rate increase.

NSP's witness, Paul Pender, testified that "NSP's five-year historical earnings per share growth rate equals 0.49% while the Company's ten-year historical earnings per share growth rate equals 3.60%." Thus, the "results of a DCF analysis would vary greatly depending on whether the analyst used a five- or ten-year earnings per share growth rate." He contended that if five-year growth rates were averaged with ten-year growth rates, the growth rate would be artificially low because the 1990 figures would be counted twice.

Dr. Luther Thompson, the Department's witness, disagreed that averaging five- and ten-year periods meant the five-year span would be double-weighted. He contended that "five- and ten-year historical growth

[*] Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn.Const. art. VI, § 10.

rates reflect the long-term stability in growth and analyst's forecasts reflect current expectations."

Matthew Kahal, the AG's witness, testified that focusing on ten-year historic growth was "out of the mainstream" of DCF analysis. Kahal noted that forecasted growth estimates, not just historical data, were used by investors.

Paul Pender recommended an ROE of 12.-5%, Dr. Luther Thompson recommended 11%, Matthew Kahal suggested 10.6%, and Peter Ahn, the MEC's witness, recommended 9.4%. The ALJ adopted Dr. Thompson's calculations, recommending an ROE of 11% with a flotation adjustment of 0.15%.

In its September 29, 1993 final order, the Commission also adopted Dr. Thompson's testimony, finding that "[h]is use of five- and ten-year historic data strikes an appropriate balance between recent trends and long-term stability" and thus allowed for the calculation of a proper growth rate. The Commission ordered an ROE of 11% but rejected the flotation adjustment.

Both NSP and the AG requested reconsideration. The Commission granted this request, and while no further oral argument or evidence was received, the Commission conducted a thorough review of the record. On January 14, 1994, the Commission released its order after reconsideration. The Commission noted that it normally used five- and ten-year historic growth averages when applying the DCF analysis, but found that to do so here would place "extra emphasis on five-year figures, since the five-year data is also included in the ten-year average."

In its 1992 NSP rate case, the Commission had deemphasized the unusual 1990 earnings data in setting the appropriate ROE for 1992. The Commission acknowledged that the final order in this case had discounted the earnings data from 1992,[1] but noted that the data from 1990 had not been deempha-

sized. Accordingly, the Commission adopted the calculations of Paul Pender, who used only the ten-year model. The Commission also ordered the flotation adjustment recommended by the ALJ, making the final ROE 11.47%.[2]

The AG, the Department, and the MEC appealed the rate increase. This court consolidated their gas and electric rate appeals.

## ISSUES

1. Was the Commission's adoption of the ten-year historic growth model arbitrary and capricious?

2. Was the Commission's adoption of an 11.47% return on equity supported by substantial evidence?

## ANALYSIS

This is an appeal from the order after reconsideration of the Minnesota Public Utilities Commission that NSP stockholders receive an authorized rate of ROE, return on equity, of 11.47% on gas and electric rates. The proper determination of the growth rate to calculate ROE is the issue on appeal.

### Rates in General

#### A. Standard of Review

Judicial review of administrative agency decisions is governed by the Minnesota Administrative Procedure Act. Minn.Stat. § 14.69 (1992). This court may affirm, remand, reverse or modify the decision if the substantial rights of the petitioners have been prejudiced because the administrative finding, inferences, conclusion or decision are

(e) unsupported by substantial evidence in view of the entire record as submitted; or

(f) arbitrary or capricious.

*Id.*

 Decisions of administrative agencies are presumed to be correct. *Schoen v. County of St. Louis,* 448 N.W.2d 112, 114 (Minn.App.1989). Deference should be

---

1. The growth rate in 1992 was also abnormally low due to an usually cold summer.

2. Commissioners Kitlinski and Knaak dissented from the order after reconsideration. They noted that the "majority did not have the benefit of new evidence or arguments," allowing reconsideration to become "a forum to rehash old arguments and rethink well-considered findings and conclusions."

shown by courts to an agency's expertise and special knowledge in the field of its technical training, education and experience. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977).

■ On appeal, relators contend that the arbitrary and capricious standard must be applied first, and that once the Commission has explained its departure from precedent, then a question to be reviewed under the substantial evidence test may occur. But these are separate tests and may be applied independently.

■ The establishment of a rate of return is a quasi-judicial function that involves a factual determination which is reviewed under the substantial evidence test. *Hibbing Taconite Co. v. Minnesota Pub. Serv. Comm'n,* 302 N.W.2d 5, 9 (Minn.1980). Agency decisions have been reviewed under both the arbitrary and capricious standard and the substantial evidence test. *See In re Joint Petition of Space Ctr. Transp.,* 444 N.W.2d 575, 580–81 (Minn.App.1989) (holding that substantial evidence test and arbitrary and capricious standard are separate grounds for rejecting agency findings), *pet. for rev. dismissed* (Minn. Oct. 19, 1989); *In re Minnesota Power's Transfer of M.L. Hibbard Units 3 and 4,* 399 N.W.2d 147 (Minn.App.1987) (reviewing agency decision not to reduce public utility's rates upon approving transfer of property under both tests).

## B. Reasonable Rates

Minn.Stat. § 216B.03 (1992) mandates that every public utility rate "shall be just and reasonable." The public utility seeking the rate change has the burden of proving that it is just and reasonable. Minn.Stat. § 216B.16, subd. 4 (1992). Any doubt as to reasonableness should be resolved in favor of the consumer. Minn.Stat. § 216B.03.

■ "It is clear the Commission has great latitude in making rate decisions." *In re Petition of Interstate Power Co.,* 419 N.W.2d 803, 807 (Minn.App.1988). The Commission must consider "the right of the utility and its investors to a reasonable return, while at the same time establishing a rate for consumers which reflects the cost of service rendered plus a 'reasonable' profit for the utility." *Northern States Power Co. v. Minnesota Pub. Utils. Comm'n,* 344 N.W.2d 374, 378 (Minn.1984), *cert. denied* 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 850 (1984). To fix a rate of return, the Commission must

(a) determine the value of the utility company's property represented by the shareholders' equity;

(b) establish a fair rate of return that provides earnings to investors comparable to the earnings from businesses with similar risks and that allows the company to maintain its financial integrity and locate new capital; and

(c) compute the company's expenses of operating including corporate taxes and depreciation reserves.

*See Hibbing Taconite,* 302 N.W.2d at 10 (citing *Northwestern Bell Telephone Co. v. State,* 299 Minn. 1, 5–6, 216 N.W.2d 841, 846 (1974)). The rates are then "authorized in an amount which will equal the sum of the return to investors and the company's operating expenses." *Id.* Rates may not be unconstitutionally confiscatory. *See id.* (citing *Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n,* 262 U.S. 679, 690, 43 S.Ct. 675, 678, 67 L.Ed. 1176 (1923); *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944)).

## I. Arbitrary and Capricious Standard

■ Relator AG argues that the Commission's reconsideration order is arbitrary and capricious because it fails to explain its departure from past practice and the ALJ's recommendation.

An agency's decision is arbitrary or capricious if it represents the agency's will and not its judgment. *Markwardt v. Water Resources Board,* 254 N.W.2d 371, 374 (Minn. 1977).

An agency ruling will be deemed arbitrary and capricious if

(a) the agency relied on factors not intended by the legislature;

(b) it entirely failed to consider an important part of the problem;

(c) it offered an explanation that is contrary to the evidence; or

(d) the decision is so implausible that it cannot be explained as a difference in view or the result of the agency's expertise.

*See Space Ctr. Transp.*, 444 N.W.2d at 581 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)).

■ "An agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent." *Peoples Natural Gas Co. v. Minnesota Pub. Utils. Comm'n*, 342 N.W.2d 348, 353 (Minn.App.1983), *pet. for rev. denied* (Minn. App. Apr. 24, 1984) (citing *Mississippi Valley Gas Co. v. Federal Energy Regulatory Comm'n*, 659 F.2d 488, 506 (5th Cir.1981)); *see also Hibbing Taconite*, 302 N.W.2d at 12 (nothing in record indicates why Commission abandoned position after one year). If an agency fails to explain why it rejected the ALJ's finding, it is evidence of the agency's desire to exercise its will and not its judgment. *Northern Messenger, Inc. v. Airport Couriers, Inc.*, 376 N.W.2d 285, 290 (Minn. App.1985), *pet. for rev. denied* (Minn. Jan. 17, 1986). But the agency is not bound to a rigid adherence to precedent, and where evidence in the record differs from previous cases, results may differ as well. *See Peoples Natural Gas*, 342 N.W.2d at 353.

The Commission has long used the discounted cash flow method to determine ROE.[3] *See, e.g. Minnesota Power & Light Co. v. Minnesota Pub. Util. Comm'n*, 342 N.W.2d 324, 326 (Minn.1983). Because a determination of a growth rate involves predictions, assumptions, and judgments, "the ultimate decision of the commission is necessarily based on agency judgment and expertise." *Minnesota Power & Light*, 342 N.W.2d at 330 (citation omitted).

In its order after reconsideration, the Commission acknowledged that it traditionally had used five- and ten-year averages to determine growth rate. The Commission determined that investors would discount the five-year data as "not likely to be sustained in the future," thus the data must be given less weight in projecting a growth rate. Otherwise, the five-year figure would be double-counted when averaged with the ten-year figure (which already contained the five-year period). The Commission determined that considering only the ten-year average was the proper method of discounting the five-year data.

Here, the discounted cash flow calculation made by each witness involved a number of judgments and the Commission "was conversant with the evidence offered by all of the witnesses." *See Peoples Natural Gas*, 342 N.W.2d at 354. We find that the Commission considered investor expectations, weighed the historic growth periods in its DCF analysis and relied on evidence in the record. While it is desirable for the Commission to provide a more thorough explanation of its departure from past practice, we cannot say that its order is arbitrary and capricious.

## II. Substantial Evidence Test

■ The substantial evidence test has been defined as

(a) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;

(b) more than a scintilla of evidence;

(c) more than "some evidence";

(d) more than "any evidence"; and

(e) evidence considered in its entirety.

*See Peoples Natural Gas Co.*, 342 N.W.2d at 351. A reviewing court also must recognize correlative rules or principles of the substantial evidence test, such as

(a) unless manifestly unjust, the court must accept inferences even if contrary inferences appear better supported;

(b) the court must give substantial deference to the fact-finding processes of the administrative agency; and

(c) the appellant must establish that the findings of the agency are unsupported by

---

**3.** As described earlier, under the DCF method, Return on Equity = Dividend Yield + Growth Rate in the DCF model.

the evidence in the record when considered in its entirety.

*Id.*

Dr. Thompson did not include 1992 in his calculations. Thus, only 1990 could have been inappropriately emphasized. It is significant that the Commission itself noted that 1992 was excluded, but 1990 was not. *See Interstate Power Co.,* 419 N.W.2d at 808 (Commission set its rate cognizant of the fact that certain items were not included in the test year calculations).

The Commission may focus on certain witnesses' testimony, and give one witness's testimony more weight. *Minnesota Power & Light Co.,* 342 N.W.2d at 330 (affirming Commission's decision that gave one witness's recommendation twice as much weight as another's). Thus, the Commission properly may focus on Thompson's testimony in its final order, and on Pender's testimony in its order after reconsideration.[4]

We note that no new evidence or oral argument was offered to the Commission, and that only one expert, Paul Pender, supported the exclusive use of a ten-year historic growth figure. It is desirable for the Commission to identify the specific evidence on which it relied, and to explain why it discounted contradictory evidence. Here, the

Commission acknowledged its departure from past decisions, identified NSP's growth data, and explained that this data included "both high and negative growth" that would reflect investor expectations.

A more detailed weighing of the conflicting evidence would have been appropriate. But an agency decision may be upheld where each witness testified that a different calculation was reasonable even though no witness gave testimony supporting the figure chosen by the Commission. *See In re Petition of Northern States Power Co.,* 416 N.W.2d 719, 724–25 (Minn.1987). Given our deference to the Commission's expertise, we must affirm its decision.

### DECISION

The order after reconsideration by the Minnesota Public Utilities Commission was not arbitrary and capricious, and was supported by substantial evidence.

**Affirmed.**

---

4. But the existence of some testimony does not provide substantial evidence per se. *See Northern Messenger,* 376 N.W.2d at 289–90 (holding that testimony by two witnesses that local cartage service was "prompt" and "superior" did not prove need for service; ALJ had not found need).