529 N.W.2d 413 (1995)
MINNEGASCO, a DIVISION OF NORAM ENERGY CORP., f/k/a Minnegasco, a Division of Arkla, Inc., Relator (C5-94-1820),
Northern States Power Co., et al., Relators (C7-94-1821),
v.
MINNESOTA PUBLIC UTILITIES COMMISSION, Minnesota Alliance for Fair Competition, Respondents.
Nos. C5-94-1820, C7-94-1821.
Court of Appeals of Minnesota.
March 28, 1995.
Review Granted May 31, 1995.
*416 Samuel L. Hanson, Briggs and Morgan, Miggie E. Cramblit, Brenda A. Bjorklund, Minnegasco, Div. of NorAm Energy Corp., Minneapolis, for relator Minnegasco.
Michael J. Bradley, M. Cecilia Ray, Moss & Barnett, Minneapolis, for relator Northern States Power.
Hubert H. Humphrey III, Atty. Gen., Margie E. Hendriksen, Asst. Atty. Gen., St. Paul, for respondent MN Public Utilities Com'n.
James D. Larson, Wurst, Pearson, Larson, Underwood & Mertz, John F. Beukema, Scott W. Johnson, Faegre & Benson, Minneapolis, for amicus curiae American Gas Ass'n.
Considered and decided by RANDALL, P.J., KLAPHAKE and DAVIES, JJ.

OPINION
DAVIES, Judge.
Minnesota Alliance for Fair Competition (Alliance) filed a complaint with respondent Minnesota Public Utilities Commission (the Commission) alleging that relator Minnegasco used the goodwill of its regulated utility operations to subsidize its unregulated appliance sales and repair services business and used its emergency gas leak response program to subsidize its unregulated appliance sales.[1]
The Commission ultimately ordered that Minnegasco's goodwill be valued to the extent it benefits Minnegasco's unregulated operations, and that this value be imputed as revenue to Minnegasco in subsequent rate-setting cases and that gas leak response costs be allocated in part to unregulated operations. Minnegasco appeals these and related decisions. Northern States Power (NSP), having been granted participant status, joins Minnegasco in appealing the Commission's decision with respect to goodwill. We affirm.

FACTS
Alliance, a trade association of appliance sellers, seeks to "level the playing field" on which its members compete with utilities for appliance sales. Its claim is based upon Minnesota rate regulation law, which provides that Minnegasco and other utilities are to receive an economically appropriate rate of return on their investments  but no more. In rate setting, every cost that is allocated to the regulated operation reduces net revenue and thus will increase the rates allowed by the Commission; similarly, each revenue item that can be excluded from the calculation reduces net revenue of the regulated operations and will also lead to higher rates. Therefore, Alliance is attempting in this proceeding to push certain revenues into, and pull certain costs out of, the regulated part of the utility's business.
Early in this proceeding, the Commission ordered Minnegasco to adopt the cost allocation principles of the Federal Communications Commission (FCC).[2] Later, in response to Alliance's complaint that Minnegasco had failed to properly implement the FCC framework, and after various preliminary proceedings, the Commission ordered a contested case proceeding on allocation issues.
An administrative law judge (ALJ) conducted a contested case hearing and made findings of fact, conclusions, and a recommended order. Minnegasco filed exceptions *417 to the ALJ's report. The Commission heard arguments and issued an order contrary to most of the ALJ's proposals.
On the issue of requiring Minnegasco's unregulated enterprises to pay for capitalizing on the goodwill of its regulated business, the Commission noted the "classic precept" that goodwill has no value in monopoly situations, but it held that diversification compelled the Commission to "reassess this issue in light of the new utility realities." Hence, the Commission concluded that goodwill should be recognized as an asset belonging in part to rate payers that may not be transferred from a regulated operation to another operation without considering it as a revenue to the regulated utility. The Commission then deferred valuation of the goodwill to Minnegasco's ongoing rate case (and, by implication, to all subsequent rate cases).
The Commission also ordered that the costs of responding to gas leaks be allocated according to whether the suspected leak is on lines and equipment owned by the utility or the customer. Such an allocation, the Commission said, comported with FCC principles of cost causation.
The Commission further decided that the costs of this proceeding should be allocated 100 percent to Minnegasco's unregulated operations because
[t]he costs of this investigation would not have arisen if Minnegasco had not made the past decision to add a nonregulated appliance sales and service business to its regulated enterprise.
Minnegasco and Alliance both petitioned for a rehearing, and NSP, with others, requested participant status in the proceedings. The Commission granted NSP's request, but denied Minnegasco's and Alliance's requests for reconsideration. Minnegasco then obtained a writ of certiorari to this court.

ISSUES
I. Did the Commission err in treating the value of Minnegasco's goodwill as a source of imputed revenue for rate regulation purposes?
II. Did the Commission err in allocating the costs of emergency gas leak responses between Minnegasco's regulated and unregulated businesses?
III. Did the Commission err in charging the costs of this proceeding to Minnegasco's unregulated operations?

ANALYSIS
Judicial review of an administrative agency decision is governed by the Minnesota Administrative Procedure Act. Minn.Stat. § 14.69 (1992). This court may affirm, remand, reverse, or modify the decision if the substantial rights of the petitioners have been prejudiced because the administrative findings, inferences, conclusions, or decision is
(e) unsupported by substantial evidence in view of the entire record as submitted; or
(f) arbitrary or capricious.
Id.
Substantial evidence under clause (e) has been defined as
(a) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;
(b) more than a scintilla of evidence;
(c) more than "some evidence";
(d) more than "any evidence"; and
(e) evidence considered in its entirety.
Peoples Natural Gas Co. v. Minnesota Pub. Utils. Comm'n, 342 N.W.2d 348, 351 (Minn. App.1983), pet. for rev. denied (Minn. Apr. 24, 1984). A reviewing court must also recognize correlative rules or principles of the substantial evidence test, such as: (a) unless manifestly unjust, the court must accept inferences even if contrary inferences appear better supported; (b) the court must give a substantial deference to the fact-finding processes of the administrative agency; and (c) the appellant must establish that the findings of the agency are unsupported by the evidence in the record when considered in its entirety. Id.
An agency's decision is arbitrary or capricious under clause (f) if it represents the agency's will and not its judgment. Id. (citing Markwardt v. State, 254 N.W.2d 371, 374 *418 (Minn.1977)). The ruling is arbitrary and capricious if the agency: (a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise. In re Space Ctr. Transp., 444 N.W.2d 575, 581 (Minn.App. 1989). If there is room for two opinions on a matter, the decision is not arbitrary or capricious, even though the court may believe that an erroneous conclusion was reached. In re Rochester Ambulance Serv., 500 N.W.2d 495, 499 (Minn.App.1993) (citing Brown v. Wells, 288 Minn. 468, 472, 181 N.W.2d 708, 711 (1970)).
A decision of an administrative agency is presumed to be correct. In re Northern States Power Gas Util., 519 N.W.2d 921, 923 (Minn.App.1994). Courts should show deference to an agency's expertise and special knowledge in the field of its technical training, education, and experience. Id. at 923-24 (citing Reserve Mining Co. v. Herbst, 256 N.W.2d 808, 824 (Minn.1977)).

I. GOODWILL
The Commission, rejecting the ALJ's legal conclusion, ruled that the value of goodwill could be imputed as revenue for rate-making purposes. The parties disagree on the standard of review to be applied to this issue. The Commission argues that this is a question of policy and the applicable standard is deference to the Commission's expertise; Minnegasco argues that this is a question of law to be reviewed de novo. Both are correct  on separate aspects. Minnegasco further argues, and we agree, that the Commission's decision should also be reviewed under the substantial evidence standard.

A. Statutory Authority
Minnegasco first claims that the Commission's decision regarding goodwill exceeds the Commission's statutory authority. This is a question for de novo review.
The Commission relies on Minn.Stat. § 216B.48 (1992), which gives it supervisory control over affiliate transactions to the extent necessary to protect and promote the public interest. The Commission also relies on Minn.Stat. §§ 216B.03, .08 (1992), which require it to establish just and reasonable rates. Minnegasco responds that neither statute explicitly grants the Commission authority to "tax" unregulated operations for the benefit of rate payers.
It would seem, however, that if the Commission has statutory authority to protect rate payers from having to subsidize a utility's unregulated operations, it would also have statutory authority to require an imputation of revenue where imputation is necessary to avoid such a subsidy. And other jurisdictions have found, given the trend toward utility diversification, that state commissions have authority to impute revenue for goodwill that benefits a utility's unregulated operations. See e.g., United Tel. Long Distance, Inc. v. Nichols, 546 So.2d 717, 720 (Fla.1989); Rochester Tel. Corp. v. Public Serv. Comm'n of N.Y., 201 A.D.2d 31, 614 N.Y.S.2d 454, 457-58 (1994); Turpen v. Oklahoma Corp. Comm'n, 769 P.2d 1309, 1325, 1327-28 (Okla.1989).

B. Arbitrary and Capricious
Minnegasco next claims that the Commission's decision on goodwill is arbitrary and capricious because the Commission provided no justification for not following the ALJ's recommendations. We agree that the Commission must explain why it rejects the ALJ's finding. In re Northern States Power Gas Util., 519 N.W.2d at 925. It did so.
The Commission set forth a reasoned decision, concluding that the need to impute revenue arises from the recent trend toward diversification by utilities. The Commission rejected the argument that goodwill belongs to utility shareholders, explaining that the goodwill is a byproduct of regulated operations and the costs of those regulated operations are borne by rate payers. Thus, value paid for by rate payers in the first place would be lost to them if the utility were permitted to "give away" this "asset" without compensation. The Commission also explained why the adoption of the FCC's cost *419 allocation principles does not resolve the issue of imputed revenue.
Further, the issues decided here will be applied to future rate cases; they thus are in the nature of rate-making policies and legislative in nature. Under such circumstances, the Commission is entitled to great deference. See In re Applications for Auth. to Provide Alt. Operator Servs. in Minn., 490 N.W.2d 920, 925 (Minn.App.1992) (commission's policy decisions regarding changing industry conditions are legislative; decision affirmed absent evidence that commission clearly abused discretion), pet. for rev. denied (Minn. Dec. 15, 1992).
The Commission set out reasons for departing from the ALJ's recommendations; its decision is not arbitrary or capricious.

C. Unconstitutional Taking
Minnegasco also claims that the Commission's decision on goodwill is an unconstitutional taking of private property because it denies Minnegasco the opportunity to recover from rate payers the full cost of providing service. See Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944) (commission should establish just and reasonable return sufficient to assure confidence in the financial integrity of the enterprise).
Minnegasco cites a host of United States Supreme Court cases in support, but these cases are not on point because none consider the imputation of revenue where affiliates use a utility's name, reputation, or other intangibles. Other jurisdictions have found no unconstitutional taking under like circumstances and there is no basis for finding that one has occurred here. See, e.g., United Tel. Long Distance, Inc., 546 So.2d at 720; Rochester Tel. Corp., 614 N.Y.S.2d at 459.

D. Substantial Evidence
Minnegasco claims that the Commission's decision regarding goodwill is unsupported by substantial evidence because the record shows that, where costs are properly allocated under FCC principles, there can be no subsidy. Minnegasco asserts that cost allocation procedures by themselves assure there will be no subsidy; those procedures, the utility claims, allocate costs so that rate payers pay no more than the costs incurred to provide service (the costs of physical facilities, labor, or supplies).
The Commission counters that the relevant FCC report stated explicitly that it did not address how to treat intangible benefits because that issue was outside the notice of proposed rule-making. The Commission noted that, although there was a split of authority among state commissions, a number have imputed goodwill value to protect rate-payer interests. And the Commission noted evidence in the record establishing that the goodwill of the regulated utility had value in a competitive market. The Commission's decision was supported by substantial evidence.

II. EMERGENCY GAS LEAK RESPONSE COSTS

A. Statutory Authority
Minnegasco claims the Commission has no statutory authority to allocate the cost of responding to emergency gas leak reports between Minnegasco's regulated and nonregulated operations. The Commission found that the costs of responding to suspected gas leaks should be charged in part to the regulated entity (if the gas leak is on the utility system) and in part to the nonregulated operations (if the gas leak is on internal piping or is associated with an appliance). The Commission found this allocation method consistent with FCC precedent, and with causation.
Minnegasco argues that Minn.Stat. § 216B.16, subd. 11 (1992), requires all gas leak response costs to be allocated to the regulated utility. Subdivision 11 provides that all costs necessary for a public utility to comply with state pipeline safety programs must be recognized and included by the Commission in its determination of rates. Minn.Stat. § 216B.16, subd. 11. And state pipeline safety programs require utilities to respond to all emergency leak calls. See Minn.Stat. § 299J.07, subd. 1 (1992). Minnegasco reasons that, since it is required to respond to all such calls, cost allocation between *420 the regulated and nonregulated entities is improper.
The Commission found, however, that subdivision 11 was inapplicable to this case because its application does not take account of a regulated utility having established a nonregulated business. We agree, and also note that the statute only requires that all necessary costs of responding to emergency gas leak reports be recognized in the determination of rates. It is not necessary for Minnegasco's regulated operations to bear the cost of responding to all emergency gas leak reports without reimbursement. The utility may pass on the costs of responding to emergency gas leaks to its nonregulated affiliate if the affiliate should be charged with responsibility for "causing" the leak (either in fact or constructively). The Commission's statutory authority extends to the decision it has made on this issue.

B. Arbitrary and Capricious
Minnegasco claims that the Commission's finding with regard to the emergency gas leak response costs is arbitrary and capricious because it departs from precedent, citing an earlier Commission order. We disagree. The Commission order cited by Minnegasco involves customers who would be required to pay for emergency gas leak checks if the costs for such checks were not allocated to the utility. But no such requirement is at issue here. The Commission's decision is not arbitrary and capricious because it is consistent with the evidence in the record, is not implausible, and reflects consideration of all important aspects of the problem presented.

C. Substantial Evidence
Minnegasco claims that the Commission's distinction between inside and outside piping for the purpose of allocating costs is not supported by substantial evidence. Specifically, Minnegasco claims that the example of FCC telephone cost allocations cannot appropriately be applied here because the safety concerns implicated by reports of leaking gas are absent from reports of malfunctioning telephones. Minnegasco's concern is that if the cost of responding is not allocated to the regulated utilities for rate setting, utilities will impose charges on customers  discouraging them from requesting gas leak checks.
We disagree, however, because the question here involves costs allocated between a utility's unregulated and regulated operations, rather than costs between the utility and its customers. Minnegasco has adduced no evidence suggesting that the Commission's decision will force utilities to pass the costs on to customers, thus, discouraging requests for gas leak detection service. The appliance sales operation can include the cost in its overhead.
The Commission's decision to use the FCC precedent for allocating costs is supported by substantial evidence.

III. ALLOCATION OF COSTS OF THE PROCEEDING
The Commission properly allocated 100 percent of the costs of this proceeding to the nonregulated entity on the ground that the Commission is not required to assign costs according to general principles of cost allocation, but, rather, in special circumstances can order a specific allocation, even if the allocation is an exception to FCC methods.
Furthermore, the Commission correctly claims that the FCC report, although it addresses the allocation of costs for compliance audits, did not reach the issue of how to allocate costs in a complaint proceeding. The Commission ordered allocation of the costs of the proceeding to the unregulated enterprise on the basis that, if Minnegasco had not added a nonregulated appliance sales and service business to its enterprise, these costs would not have been incurred. The Commission's decision on proceeding costs is not arbitrary and capricious.

DECISION
The Commission has the statutory authority for rate-making purposes to impute as revenue to regulated operations the value a utility's goodwill has to its unregulated operations and to require that the costs of responding *421 to emergency gas leak inspection requests be allocated between the unregulated and regulated operations of the utility. The Commission's decisions in this regard were supported by substantial evidence and were not arbitrary or capricious. The Commission's decision with regard to the costs of this proceeding was not arbitrary or capricious.
Affirmed.
NOTES
[1] Alliance also complained that Minnegasco offered preferential treatment to rate payers who used the unregulated services. That complaint is no longer part of this proceeding.
[2] At that time, the Commission stated that

Minnegasco's current cost allocation procedures do not identify the costs of unregulated operations with enough precision, do not deal equitably with fixed, utility-related costs, and do not reflect a unified approach to cost allocation. With the assistance of the parties, the Commission could design a comprehensive costs allocation system. It is unnecessary to commit the resources of the parties and state regulators to this project, however, since the FCC has already developed a comprehensive cost allocation framework that will meet the needs of this case.
At that time, the Commission also concluded that the record contained no evidence of preferential treatment of rate payers who used Minnegasco's appliance sales and repair services, and that nothing in Minnegasco's operation of its appliance sales and repair business made necessary a structural separation of Minnegasco's regulated and unregulated operations.