In the Matter of the EXCESS SURPLUS STATUS OF BLUE CROSS AND BLUE SHIELD OF MINNESOTA.

No. C5–99–1383.

Court of Appeals of Minnesota.

Feb. 29, 2000.

Review Granted April 25, 2000.*

* PAGE, GILBERT and RUSSELL A. ANDERSON, JJ., took no part in the consideration of this case.

Michael V. Ciresi, Deborah J. Palmer, David W. Beehler, Joel A. Mintzer, Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, for relator Blue Cross and Blue Shield.

Mike Hatch, Attorney General, David M. Aafedt, Assistant Attorney General, St. Paul, MN, for respondent Commissioner of Commerce.

John J. McDonald, Jr., Thomas E. Propson, Jenneane L. Jansen, Meagher & Geer, P.L.L.P., Minneapolis, for intervenor Scott Johnson.

Jack L. Chesnut, Karl L. Cambronne, Jeffrey Donald Bores, Chestnut & Cambronne, P.A., Minneapolis, and Samuel D. Heins, Daniel E. Gustafson, Daniel C. Hedlund, Heins, Mills & Olson, P.L.C., Minneapolis, Hugh V. Plunkett, III, Robert K. Shelquist, Plunkett, Schwartz & Peterson, Minneapolis, for amicus American Continental Inc.

Considered and decided by DAVIES, P.J., CRIPPEN, and PETERSON, JJ.

## OPINION

CRIPPEN, Judge.

After recovering $469 million as part of the 1998 settlement of Minnesota tobacco litigation, relator Blue Cross and Blue Shield of Minnesota found itself with a quantity of surplus prohibited by law for a nonprofit health service plan corporation. These are administrative proceedings in which the respondent Commissioner of Commerce has explored the question of whether to approve the plan that Blue Cross developed to adjust its operations so that its surplus condition would be corrected.

Striking or altering more than 50 of the 200 findings of fact of an administrative law judge who recommended approval of relator's plan—and setting aside the prior judgment of the Department of Commerce that the plan, as amended to meet earlier objections, was fair and adequate, Deputy Commissioner Gary A. LaVasseur, acting for the commerce commissioner, determined in July 1999 that the plan must be disapproved.

By ordering a contested case proceeding and then designating both agency advocates and an adjudicator, the commissioner established an approval-process setting in which the law requires of the adjudicator significant deference to both the agency experts and the ALJ. Also, the commissioner's determination of whether a nonprofit health service plan corporation has complied with the law puts upon the agency a burden to show non-compliance. Finally, the lawful scope of the commissioner's decision is narrowed by a statutory mandate to adjust future operations of the nonprofit, principally in altering premium-setting practices. Because the deputy commissioner's order exceeds his authority in its scope and in its assessment of the evidence of record, we reverse the disapproval order and remand the case for the commissioner's implementation of his predecessor's January 1999 consent order. On the record that has been made, having due regard for agency expertise and the ALJ's fact-finding, it is evident that the amended Blue Cross plan deals pragmatically and fairly with the nonprofit's surplus condition.

## FACTS

### A. Background Information

In August 1994, Blue Cross and Blue Shield of Minnesota initiated a lawsuit against cigarette manufacturers seeking to hold the industry financially accountable for the increased health care costs imposed on Blue Cross, to obtain and publicize documents regarding the industry's marketing strategies, and to change the culture of tobacco use. On May 8, 1998, Blue Cross settled its lawsuit against the tobacco companies for $469 million, which has a present value of $434 million. In a consent cease and desist order, former Deputy Commissioner of Commerce Patrick Nelson and former Commerce Commissioner David Gruenes approved Blue Cross's intended expenditure of $75 million for its tax liabilities and $21 million for Blue Cross's charitable contribution to the Blue Cross Blue Shield of Minnesota Foundation. This dispute involves Blue Cross's intended expenditure of the remaining $338 million of tobacco settlement proceeds on a tobacco-cessation pharmacy reserve, a member health awareness program, and a tobacco-cessation-and-other-risk-behavior program.

Relator's plan intends to spend $109.9 million to establish a pharmacy reserve, entitled the Tobacco Cessation Pharmacy Reserve, to cover the expense of creating a pharmaceutical benefit for tobacco-cessation programs offered to its subscribers over the next twenty-two years. Through this reserve, Blue Cross intends to provide its subscribers coverage for nicotine patches, nicotine gum, and other smoking-cessation drugs. Blue Cross estimates the reserve program will save subscribers one billion dollars over the next twenty-two years. Numerous Blue Cross providers

and members of the community submitted either written or oral comments generally supporting Blue Cross's tobacco-cessation initiatives.

Blue Cross also proposed the allocation of $148.1 million to create a health-risk-behavior program entitled the Tobacco and Other Health Risk Cessation Program. Although the initial focus of the program appears to be directed at tobacco use, Blue Cross foresees the program evolving over the next ten years to focus primarily on risk behaviors and education on such issues as: (a) immunization; (b) physical activity; (c) maintaining a balanced diet; (d) seatbelt safety; (e) other safety precautions; (f) prenatal care; and (g) screening for early detection of cancer. Blue Cross explained that the program is directed at both individual and community-focused prevention. It will: (a) deliver treatment in a variety of settings and locations; (b) be continuously evaluated for effectiveness; and (c) require enhanced technical capacities to support the programs. Numerous Blue Cross health care providers submitted comments in support of Blue Cross's plan because it would reduce smoking and promote better health for all Minnesotans. Blue Cross estimates the program will save approximately $1.25 billion in health care costs over the next twenty-two years.

In addition, Blue Cross proposed the allocation of $80 million to establish a health awareness program, entitled the Member Health Awareness Program. Essentially, the program is intended to provide subscribers with a menu of options for ways to improve their health and safety. For instance, Blue Cross explained that the program might focus on home safety for a period of time, providing information on the leading causes and preventive techniques for home injuries. At other times, the program may focus on issues such as youth, family and senior safety; life-long fitness; nutrition; and emotional health. In addition, the program may give away free items, such as cookbooks, vegetable steamers, food scales, food storage containers, and stress-test wallet cards to Blue Cross subscribers, in an attempt to promote and facilitate healthy lifestyles. Blue Cross does not anticipate any long-term savings from the program. Instead, it estimates that the program's funds will be exhausted 2 ½ years after the inception of the program.

By statute in Minnesota, when a non-profit health service plan corporation has a surplus in excess of 33 1/3% of the sum of all health service claims incurred, plus administrative expenses incurred within the most recent calendar year, the corporation must design a plan to adjust its operations to correct the condition. *See* Minn. Stat § 62C.09, subd. 3 (1998) (setting the permissible "corridor" for surplus at a minimum of 16 2/3% and a maximum of 33 1/3% of the sum of all health service claims incurred, plus administrative expenses incurred within the most recent calendar year). Relator does not dispute, for purposes of this litigation, that the entire $338 million expenditure plan deals with funds in excess of its permissible surplus corridor.

## B. Agency Consent Orders

Recognizing that its May 8, 1998 settlement with the tobacco industry would result in an excess-surplus condition, Blue Cross submitted a plan to correct the condition for the commissioner's approval on September 23, 1998. *See* Minn. Stat § 62C.09, subd. 4 (1998) (requiring commissioner's approval of nonprofit's written plan to adjust its operations to correct the surplus condition). Following submission of the plan, discussions between Blue Cross and the Department of Commerce began. Because Commissioner Gruenes wanted the plan to contain a more immediate benefit to Blue Cross members and the department suggested including a member health awareness program, Blue Cross submitted an amendment to its original plan in late October 1998. Blue Cross continued discussions with the department

throughout the fall of 1998 to address concerns regarding oversight, financial reporting, and the need for structure and detail in the plan.

On December 31, 1998, the department and Blue Cross entered into a consent order that resolved the department's objections to Blue Cross's plan. The consent order added a reporting framework, provided for an independent analysis of the relator's plan at least every three years—with regard to the spending of tobacco-settlement proceeds and possible marketplace-competition advantages accruing to Blue Cross—and established a regulatory framework. Moreover, the consent order required Blue Cross to outline its spending plans for the health awareness and risk-behavior programs for the commissioner's approval or disapproval. Under the consent order, relator was precluded from appealing the commissioner's disapproval of these spending plans.

After discussions between the department, relator Blue Cross, and the intervenors, HealthPartners and Scott Johnson, the department issued an amended consent order on January 22, 1999, to delineate the fiscal and accounting segmentation of the tobacco settlement proceeds and to facilitate the regulatory monitoring of the tobacco-settlement funds. The amended consent order supercedes the December 31 consent order and includes the department's determination that relator's plan, as amended in October and modified by the amended consent order, is "in the public interest, adequately meets the applicable statutory obligations and mandates, including compliance with the statutory limits of Minn.Stat. § 62C.09 (1998) within a reasonable time, and is fair and equitable to subscribers." In addition, the amended consent order explicitly recognizes that it is dispositive of HealthPartners' objections to the Blue Cross plan.

1. David Gruenes has since resigned as Commissioner of Commerce.

2. Although TCF Bank was also allowed to intervene, Deputy Commissioner did not give

## C. Administrative Litigation

After Blue Cross's historic $469 million settlement with the tobacco companies, the Commissioner of Commerce, David B. Gruenes,[1] notified Blue Cross that the settlement proceeds would cause its surplus levels to exceed the permissible corridor. Commissioner Gruenes required Blue Cross to submit a plan of action to correct that excess surplus and decided to conduct a contested case proceeding under the Minnesota Administrative Procedures Act to determine if the plan properly remedied Blue Cross's excess-surplus condition within a reasonable time. In the notice for the public hearing, Commissioner Gruenes explained that the propriety of the plan would be adjudged by whether the plan: (a) meets the requirements of Minn.Stat. § 62C.09, subd. 4, that Blue Cross adjust its operations to correct the excess surplus; (b) is fair and equitable to Blue Cross subscribers; (c) will adversely impact the regulation and orderly operation of Minnesota's insurance and health industries; and (d) is in the public interest of Minnesota citizens.

Commissioner Gruenes decided that the department would participate in the proceedings. The department was represented by Commissioner Gruenes and Deputy Commissioner Nelson, who headed the insurance and registration division of the department. In addition, Commissioner Gruenes delegated the decision-making authority to approve or disapprove the plan to Deputy Commissioner LaVasseur. Although Deputy LaVasseur provided two opportunities for interested parties to petition to intervene, only Scott W. Johnson, a former Blue Cross fully-insured group member, and HealthPartners, Inc., one of Blue Cross's major competitors, did so.[2]

TCF full party status. Instead, TCF was limited to written arguments, which, incidentally, mirrored the arguments offered by intervenor Johnson.

An ALJ conducted the contested case hearing between January 25 and January 27, 1999. The judge ordered the department, HealthPartners, and intervenor Johnson to file their objections to the plan. The parties engaged in extensive discovery regarding the objections to the Blue Cross plan. Of the twenty witnesses testifying at the hearing, only intervenor Johnson opposed the plan. Moreover, seventy-six of the ninety-three written comments submitted, supported the Blue Cross plan, including the written comment submitted by Allina Health Systems, Blue Cross's other major competitor. The record closed in February 1999, after the parties submitted post-hearing memoranda and proposed Findings of Fact and Conclusions of Law. In March, after reviewing the record, the ALJ issued his extensive findings of fact, with 33 conclusions of law and a nine-page memorandum, recommending to Deputy Commissioner LaVasseur that the plan be approved. The deputy commissioner advised each of the parties of the opportunity to file exceptions and arguments regarding the ALJ's recommendation. Intervenor Johnson and the department timely filed their exceptions and arguments and, although relator and Johnson each filed correspondence after the stated deadline, the deputy commissioner considered the documents in his discretion.

In July 1999, Deputy Commissioner LaVasseur issued an order disapproving relator's plan to correct its excess-surplus situation. The deputy commissioner struck 38 of the ALJ's findings of fact and modified 15 others. He struck 10 of the ALJ's 33 conclusions of law and added 11 others. In an 18–page memorandum accompanying his disapproval order, the deputy commissioner said that the Blue Cross plan: (a) wrongfully permits Blue Cross to maintain control of the funds, contradicting the statutory mandate to adjust its operations to correct the excess surplus; (b) is not fair and equitable to Blue Cross subscribers; (c) could adversely impact the regulation and orderly operation of Minnesota's insurance and health industries; and (d) is not in the public interest of Minnesota citizens. Relator petitioned for review of Deputy Commissioner LaVasseur's decision.

## ISSUES

1. Did the deputy commissioner err in adjudicating disapproval of relator's plan on the rationale that the plan wrongfully failed to prescribe rebates to past subscribers?

2. Did the deputy commissioner err in assessing the absence of department control over relator's implementation and maintenance of its plan or in assessing the market impact of the plan?

## ANALYSIS

### I.

### *Standard of Review*

We must determine whether the deputy commissioner's disapproval decision wrongfully deprived Blue Cross of substantial rights because it was affected by an error of law, was unsupported by substantial evidence, or was otherwise arbitrary or capricious. Minn.Stat. § 14.69 (1998); *see also In re Quantification of Envtl. Costs*, 578 N.W.2d 794, 799 (Minn. App.1998) (In a writ of certiorari, we determine whether the agency made an error of law, issued a decision unsupported by substantial evidence, or acted arbitrarily or capriciously.), *review denied* (Minn. Aug. 18, 1998). In addition to scrutiny for errors of law, agency decisions are reviewable under both the arbitrary-and-capricious standard and the substantial-evidence test. *See In re Petition of Northern States Power Gas Util.*, 519 N.W.2d 921, 924 (Minn.App.1994); *In re Joint Petition of Space Ctr. Trans.*, 444 N.W.2d 575, 580–81 (Minn.App.1989) (explaining that substantial-evidence and arbitrary-and-capricious standards are separate grounds for reversing agency decisions), *review dis-*

*missed* (Minn. Oct. 19, 1989). On appeal, the party seeking review bears the burden of proving the agency's decision violates one or more provisions of Minn.Stat. § 14.69. *See Markwardt v. State Water Resources Bd.*, 254 N.W.2d 371, 374 (Minn. 1977); *see also Casper v. Itasca County Human Servs.*, 531 N.W.2d 506, 508 (Minn.App.1995).

■ An agency's factual findings are reviewed under the substantial-evidence test. *Henry v. Metropolitan Waste Control Comm'n*, 401 N.W.2d 401, 404 (Minn. App.1987) (citing *Peoples Natural Gas Co. v. Minnesota Pub. Util. Comm'n*, 342 N.W.2d 348, 351 (Minn.App.1983), *review denied* (Minn. Apr. 24, 1984)). In 1977, the Minnesota Supreme Court explained that "substantial" evidence constitutes (a) such evidence as a reasonable mind might accept as adequate to support a conclusion; (b) more than a scintilla of evidence; (c) more than "some evidence"; (d) more than "any evidence"; and (e) evidence considered in its entirety. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn. 1977). When employing the substantial-evidence test, courts must recognize correlative rules or principals such as:

> (1) unless manifestly unjust, inferences must be accepted even though it may appear that contrary inferences would be better supported; (2) a substantial judicial deference to the fact-finding processes of the administrative agency; and (3) the burden is upon the appellant to establish that the findings of the agency are not supported by the evidence in the record, considered in its entirety.

*Peoples Natural Gas Co.*, 342 N.W.2d at 351 (citations omitted). After evaluating the evidence of record, an appellate court should use the substantial-evidence test and affirm an agency's decision that re-flects reasoned decision-making. *Reserve Mining*, 256 N.W.2d at 825.

■ Although an agency's findings of fact are reviewed under the substantial-evidence test, an agency's otherwise lawful judgment, based on its expertise and special knowledge, is afforded judicial deference and will be upheld unless it is arbitrary and capricious. Administrative agency decisions are presumed correct and courts should defer to an agency's expertise and special knowledge in the field of its technical training education, and experience. *Petition of Northern States Power Gas Util.*, 519 N.W.2d at 923–24. An agency's decision is subject to reversal as arbitrary and capricious where it represents the agency's will, not its judgment. *Quantification of Envtl. Costs*, 578 N.W.2d at 799; *Markwardt*, 254 N.W.2d at 374 (Minn.1977); *see also Madison v. Commissioner of Pub. Safety*, 585 N.W.2d 77, 86 (Minn.App.1998) (defining "arbitrary and capricious") *review denied* (Minn. Dec. 15, 1998).

■ An agency's failure to explain the reasons for rejecting an ALJ's finding is "evidence of the agency's desire to exercise its will and not its judgment." *Petition of Northern States Power Gas Utility*, 519 N.W.2d at 925 (citation omitted); *see In re Application of Orr*, 396 N.W.2d 657, 662 (Minn.App.1986) (stating that, although not binding, hearing examiner's findings "should not be taken lightly").

## II.

### Standards of Law

A nonprofit corporation may be created to "establish, maintain and operate a service plan providing health services." Minn. Stat. §§ 62C.03 (1998) (authorizing service plan corporations); § 62C.04 (1998) (addressing organization requirements).[3]

---

**3.** The purpose of the "Act", as enacted in 1971, is

> to promote a wider, more economical and timely availability of hospital, medical-surgical, dental, and other health services for

the people of Minnesota, through nonprofit, prepaid health service plans, and thereby advance public health and the art and science of medical and health care within the state, while reasonably regulating the for-

Although such nonprofits are required to maintain a specified level of reserves, any funds in excess of the required level of reserves are considered surplus. *See* Minn.Stat. § 62C.09, subd. 2–3 (explaining that reserves are set aside to pay expenses and liabilities, while surplus serves as a buffer against any unforeseen costs). Surplus levels must remain between a minimum of 16 and ⅔ percent and a maximum of 33 and ⅓ percent of the sum of all health service claims incurred, plus administrative expenses incurred within the most recent calendar year. Minn.Stat. § 62C.09, subd. 3 (setting permissible surplus "corridor").

A nonprofit, if its surplus is less than or in excess of the permissible corridor, must adjust its operations to correct the condition. Minn.Stat. § 62C.09, subd. 4. The operational adjustments are to be "according to a written plan proposed by the corporation and approved by the commissioner." *Id.* If a nonprofit's proposed adjustments do not correct the condition within a reasonable time, the commissioner may: (1) take action against the nonprofit under chapter 60B (an act governing rehabilitation and liquidation of insurers) or (2) proceed "under the suspension and penalty provisions of Laws 1971, chapter 568." *Id.* Relator's 1998 settlement with the tobacco industry resulted in excess surplus and the nonprofit submitted a plan to correct the condition for the commissioner's approval.

## A. Approval/Disapproval Process

For reasons never stated, the commissioner elected to conduct formal, adversarial proceedings—a contested case hearing—to determine all issues with respect to the approval of Blue Cross's plan. Minn.Stat. § 62C.09, subd. 4, prescribes no proceedings on the approval question but suggests an adversarial pursuit of suspension or other penalties in the event the nonprofit cannot correct its surplus status

within a reasonable time. Minn.Stat. § 62C.09, subd. 4. While calling for a hearing, the commissioner determined that the issue of approval or disapproval would be decided on considerations of whether the plan: (a) meets the requirements of Minn. Stat. § 62C.09, subd. 4; (b) is fair and equitable to Blue Cross subscribers; (c) would adversely impact the regulation and orderly operation of the insurance and health insurance industries in this state; and (d) is in the public interest of Minnesota citizens.

## B. Rules of Deference

■ Judicial deference to agency decisions, already stated, is in respect to agency expertise and special knowledge. *Petition of Northern States Power Gas Util.*, 519 N.W.2d at 923–24. But the agency itself has burdens of deference, and its disregard for those burdens may preclude judicial deference to its resulting decisions. Thus, the agency's failure to articulate reasons or provide evidentiary support for a decision rejecting an ALJ's findings or contradicting the agency's own experts is evidence of an arbitrary decision. *See Orr*, 396 N.W.2d at 662 (classifying commissioner's decision contradicting agency's own experts and ignoring ALJ's suggestions as arbitrary); *see also Petition of Northern States Power Gas Util.*, 519 N.W.2d at 925 (suggesting that failure to explain reason for deviating from ALJ's findings is "evidence of the agency's desire to exercise its will and not its judgment" and a sign of arbitrariness). As stated before, an arbitrary agency decision will be reversed. *Quantification of Environmental Costs*, 578 N.W.2d at 799; *Markwardt*, 254 N.W.2d at 374.

The agency's burdens of deference arise in both its quasi-judicial and its quasi-legislative capacities. In his quasi-judicial role in this case, the deputy commissioner encountered both his own agency's exper-

mation, continuation, operation, and termination of such service plans by establishment and enforcement of reasonable and

practical standards of administration, investments, surplus and reserves.
Minn.Stat. § 62C.01, subd. 2 (1998).

tise and findings of an ALJ. Agency expertise was also encountered insofar as the deputy commissioner acted in a quasi-legislative role.

■ The Minnesota Supreme Court recently explained that an agency acts in a quasi-judicial capacity by: (a) investigating a disputed claim and weighing evidence; (b) applying evidentiary facts to a prescribed standard; (c) issuing a binding decision resolving the disputed claim. *Minnesota Ctr. for Environmental Advocacy v. Metropolitan Council,* 587 N.W.2d 838, 842 (Minn.1999) (summarizing the three indicia of quasi-judicial actions proposed in *Meath v. Harmful Substance Compensation Bd.,* 550 N.W.2d 275 (Minn. 1996)). Here, the commissioner ordered a contested case hearing to gather and evaluate evidence to decide whether to approve Blue Cross's surplus-correction plan according to commissioner-established criteria. In this quasi-judicial role, the deputy commissioner could not arbitrarily disregard either the findings of the ALJ or agency expertise.

■ An agency acts in a quasi-legislative function when it exercises its statutory authority to regulate rates and protect the public interest. *See Northern States Power Co. v. City of Oakdale,* 588 N.W.2d 534, 537 (Minn.App.1999) (explaining that "rate-making is a quasi-legislative function"); *St. Paul Cos. v. Hatch,* 449 N.W.2d 130, 136–37 (Minn.1989) (stating that "the insurance industry * * * is highly regulated and intimately connected to the public welfare," especially where the agency's decision involves both regulatory and protective functions). Even in its quasi-legislative decisionmaking in this case, the deputy commissioner could not arbitrarily disregard the opinions of the agency experts.

Because the Department of Commerce's actions in this matter involve the indicia of quasi-judicial action, but are also directed at regulating rate-making practices of nonprofit health service plan corporations to ensure affordable health care is available, its actions here can be fairly characterized as both quasi-legislative and quasi-judicial in nature.

■ The commissioner claims on appeal that he could act on his own expertise rather than adhering to agency experts. Judicial deference can be given to the agency only to the extent it is evident on review that this separate expertise exists. *See Reserve Mining Co.,* 256 N.W.2d at 824 (finding occasion for deference only to the extent agency has applied its expertise and special knowledge in the field of its technical training, education, and experience.) Although an agency is not bound by an ALJ's findings or the testimony of its experts, the agency must articulate the reasons and provide substantial evidence to support a decision that rejects the ALJ's findings or its own experts' opinions. *See Orr,* 396 N.W.2d at 662.

Department of Commerce experts in this case were expected to comment on the relator's plan, and the deputy commissioner was the final decision-maker on whether to approve the plan. Mindful of the deputy commissioner's role as adjudicator in the proceedings, we have reviewed the record with an eye toward his specific declarations of fact and law. Enlarging the significance of deference due to the ALJ's findings of fact and conclusions of law, we are especially cognizant of: (a) the qualifications and expertise of the department staff assigned to the case; (b) the thoroughness of the judge's review of the plan; (c) care taken by the judge in dealing with the parties and facts and in conducting the public hearing; (d) opportunities for interested and affected parties to intervene; (e) efforts to seek consent orders in lieu of extensive litigation; (f) the desire to obtain relator's concession of agency approval authority over the entire surplus amount; and (g) interest in undisputed authority to monitor Blue Cross's future operations, its compliance with the amended consent order, the unfolding facts on the value of the plan's programs, and the legitimacy of

Blue Cross's market practices. All of these considerations substantially enlarge the practicality of the ALJ's approach to the case.

## C. Burden of Proof

This case involves the propriety of the deputy commissioner's decision to disapprove the relator's plan because it did not meet the criteria established for its approval in the contested case hearing. Minn.Stat. § 62C.09, subd. 4, simply requires that the health service plan corporation submit a written plan to correct its excess-surplus condition for commissioner approval. Minn.Stat. § 62C.09, subd. 4. As we have noted, the statute does not suggest a proceeding such as occurred in this case. Attempting to identify the burden of proof in these circumstances, we are mindful that the statute contemplates the commissioner's effort to impose sanctions on the presentation of evidence that a nonprofit has an improper-surplus status and has failed to correct it within a reasonable time. *Id.*

When agencies act in a quasi-judicial capacity, Minnesota courts have applied the usual civil burden-of-proof analysis in administrative cases. *See Johnson v. Minnesota Dept. of Human Servs.*, 565 N.W.2d 453, 458 (Minn.App.1997) (citing *In re Northern States Power Co.*, 416 N.W.2d 719, 722 (Minn.1987) and *Meath v. Harmful Substance Compensation Bd.*, 550 N.W.2d 275, 280 (Minn.1996) (Anderson, J., concurring specially)). A prima facie case will shift the burden of proof to the opposing party. *Johnson*, 565 N.W.2d at 458. Additionally, Minnesota courts require the commissioner to bear the ultimate burden of proving noncompliance with or violation of a statute. *See, e.g., Red Owl Stores, Inc. v. Commissioner of Agriculture*, 310 N.W.2d 99, 105 (Minn. 1981) (explaining the commissioner of agriculture bears the ultimate burden of proving a violation of the Dairy Act even though Minn.Stat. § 32A.04, subd. 1 (1978) provided that proof of certain conduct is

prima facie evidence of intent to violate the Act); *Pahl v. Commissioner of Public Safety*, 398 N.W.2d 67, 70 (Minn.App.1986) (requiring the commissioner to prove, by a preponderance of the evidence, that a snowmobile was operated or parked in an area subjecting the driver to the implied consent law); *see also McCullough v. Washington County Planning Dept. Div.*, 372 N.W.2d 64, 65 (Minn.App.1985) (holding the county bore the burden of proving noncompliance with a sewage-treatment-system statute).

Although an individual or entity typically bears the burden of proving entitlement to a benefit or proposed action, those cases are distinguishable because a statute, rule, or case law allocated the burden of proof. *See, e.g., In re Northern States Power Co.*, 416 N.W.2d 719, 726 (Minn.1987) (stating "enactment of Minn.Stat. § 216B.16, subd. 4 (1986), * * * placed on the petitioning utility the burden of proving the proposed rate is fair and reasonable"); *In re Interstate Power Co.*, 500 N.W.2d 501, 503 (Minn.App.1993) (explaining that Minn. Stat. § 216B.16, subd. 4 (1990) placed burden of proof on public utility); *In re Rochester Ambulance Service*, 500 N.W.2d 495, 498–99 (Minn.App.1993) (explaining that Minn. R. 1400.7300, subpt. 5 (1991) requires the party applying for a license to prove the commissioner should have granted the license); *In re Petition of Interstate Power Co.*, 419 N.W.2d 803, 806 (Minn. App.1988) (placing burden of proving rate change is just and reasonable on public utility seeking the rate change, citing *Northern States Power Co.*, 416 N.W.2d at 726). Because Blue Cross was not requesting a benefit or entitlement and no statute, rule, or caselaw addresses the burden of proof on the question of whether its surplus-correction plan is appropriate, these cases are distinguishable.

■ Once the commissioner decided to order a contested case hearing to gather, consider, and evaluate written and testimonial evidence regarding each of the commissioner-created criteria for approval of

relator's plan, he imposed on the deputy commissioner a role that was principally quasi-judicial in nature. *See Carter v. Olmsted Cty. Housing and Redevelopment Auth.*, 574 N.W.2d 725, 729 (Minn.App. 1998) (concluding that an agency acts in a quasi-judicial capacity "[b]y taking evidence and hearing testimony"). In such situations, it is appropriate to apply a classic civil burden-of-proof analysis. *Johnson*, 565 N.W.2d at 458. Here, as required by statute, Blue Cross submitted its surplus-correction plan and presented evidence at the contested case hearing on each of the commissioner-created criteria for its approval. Where the statutory scheme does not address which party bears the burden of proving compliance or noncompliance, Minnesota courts require the commissioner to bear the burden. *See Red Owl Stores, Inc.*, 310 N.W.2d at 105; *see also Pahl*, 398 N.W.2d at 70. We conclude that those who objected to Blue Cross's plan had the burden of proving that it did not comply with the criteria established for approval, especially in light of Blue Cross's prima facie showing of compliance by its presentation of the plan itself and evidence that the plan met the prescribed criteria.

## III.

### *Fairness*

The deputy commissioner concluded that relator's plan was not fair and equitable to subscribers because: (a) the "only way" to correct the surplus is to direct a premium refund; (b) it is unfair not to direct a refund because the tobacco settlement reflects recovery of money that had been passed on to Blue Cross subscribers; and (c) certain components of the plan are of questionable value and duplicative of other existing tobacco-cessation programs.

4. The Insurance Subcommittee was responding to a Blue Shield's financial crisis before

### A. *Lawfulness of Mandate for Rebate*

■ The legislature passed chapter 62C in response to a report by the House Insurance Committee – Subcommittee on Nonprofit Insurance Organizations in 1970.[4] Insurance Commissioner Thomas Hunt made eight recommendations, including a recommendation that the executive-branch Insurance Division be given authority to review premium rates of nonprofit associations when their surplus goes above or below a specified percentage of annual premiums.

The subcommittee's report and recommendations constituted its response to a financial crisis experienced by Blue Shield after its charged premiums proved insufficient to cover its costs. When enacting chapter 62C in 1971 and amending it in 1977, the legislature sought to establish a "corridor" of acceptable surplus conditions and prevent this problem from reoccurring. The legislature presumably intended to authorize an executive appointee to regulate and correct both deficient and excess premium-setting practices; no doubt the risks posed by excessive premiums are indicated by the commissioner's current identification of standards for assessing a plan to lower surplus—principally the risks of unnecessarily burdensome premiums or a resulting accumulation of funds that permits unhealthy future competition in the industry.

■ Chapter 62C does not describe a method for correcting excess surplus. The deputy commissioner in this case concluded that a rebate is the only fair and equitable way to correct relator's surplus condition, stating that the "only way to remain true to the intended purpose of the adjustment process" would require directing "such a premium adjustment benefit to the fully-insured groups who paid higher premiums" during the period used to calculate Blue Cross's tobacco-related damages. Initially, insofar as the deputy commission-

the nonprofit was taken over by Blue Cross.

er's order is based on a construction of statutory language, we must examine whether it is affected by an error of law. *See* Minn.Stat. § 14.69(d); *Boutin v. La-Fleur*, 591 N.W.2d 711, 714 (Minn.1999) (statutory interpretation presents a question of law which appellate court reviews de novo).

The statute required Blue Cross to submit a written plan for adjusting its operations to correct the excess-surplus condition. Minn.Stat. § 62C.09, subd. 4. Because past conduct cannot be "adjusted to correct the condition," *id.*, the most evident and natural meaning of the statutory phrase is to mandate the alteration and adaptation of Blue Cross's future operations. *See Tracy State Bank v. Tracy–Garvin Co–op.*, 573 N.W.2d 393, 394 (Minn.App.1998) (stating that statutory interpretation is fundamentally guided by the natural and most obvious meaning of the specific statutory language). This meaning is also consistent with the statute's principal function—to provide an on-going regulation of premium-setting that will prevent nonprofit practices from either undercharging or overcharging its subscribers.

There is no evidence that the legislature contemplated a situation requiring mandated rebates in enacting chapter 62C. Also, the statutory scheme in chapter 62C describes a process for review and prospective adjustments of nonprofit health care rate-making. Under Minn.Stat. § 62C.15, Blue Cross is required to submit its rates to the commissioner, whereupon the commissioner has 30 days to review and disapprove the rates. If the rates are not disapproved, "the charges shall be deemed approved." Minn.Stat. § 62C.15, subd. 3 (1998). Unlike other statutes, once the rates are approved, the statute provides no mechanism to withdraw the approval. *Compare* Minn.Stat. § 62C.15 (1998) *with* Minn.Stat. § 61A.02, subd. 4 (1998) and Minn.Stat. § 62A.02, subd. 4a (1998). Here, the commissioner did not disapprove Blue Cross's rates. And be-

cause the deputy commissioner adopted the ALJ's finding that there is, in any event, no evidence that Blue Cross's premium rate charges "were unreasonable or unfairly discriminatory," there is no factual basis to disapprove Blue Cross's rates.

In addition, requiring Blue Cross to rebate past premiums would not satisfy the specific criteria of chapter 62C.01. The ALJ specifically found that a rebate would have little or no health benefit and would only (a) promote health care services, (b) advance the public health, or (c) facilitate the art and science of health care to the extent that Blue Cross subscribers would spend the rebate on health benefits. The deputy commissioner struck the ALJ's findings without explanation or evidentiary support, thus concluding that relator's plan was not fair and equitable to its subscribers because it did not provide a rebate of past premiums.

■ Contrary to the deputy commissioner, the ALJ and the Department of Commerce agree that Blue Cross's plan adjusts Blue Cross's operations to correct the surplus within a reasonable time and is designed to promote health services for Minnesotans, advance public health and the art and science of health care, and establish and enforce reasonable and practical standards of administration, investments, surplus and reserves in compliance with Minn.Stat. § 62C.01, subd. 2 (1998). Although the deputy commissioner does not dispute that the relator's plan meets the statute's broad goals and objectives, he concludes the plan is not fair and equitable because it does not provide a premium refund. His decision is affected by an error of law in its analysis of the statutory mandate for adjusting operations to eliminate excess surplus. And it further conflicts with the approval scheme created by section 62C.09, subd. 4. Blue Cross's plan is subject to the commissioner's approval and must comply with the statutory objectives, but the statute states no authority of the deputy commissioner to dictate a special addition to a worthy plan that meets

the aims of the statute. Indeed, the deputy commissioner specifically determined that he "does not have the power to write the plan." The power of disallowance cannot be transformed into a power to mandate an alternative plan.

## B. Fairness of Plan without Rebates

 Singularly explaining his demand that rebates occur under the Blue Cross plan, the deputy commissioner contended that the tobacco settlement reflects recovery of money for past expenses that had already been passed on to Blue Cross subscribers. This reasoning was advanced notwithstanding the Minnesota Supreme Court's holding that the tobacco litigation was a direct action by Blue Cross and that Blue Cross, itself, had been injured and had standing to sue for its own damages. *State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 496–97 (Minn.1996) (concluding that, in enacting Minn.Stat. § 325D.57, the Minnesota legislature intended to "abolish the availability of the pass-through defense").[5] Otherwise honoring this decision, the deputy commissioner adopted the ALJ's finding that "Blue Cross brought the lawsuit for its own damages." Thus it is undisputed that Blue Cross, as an entity, brought the lawsuit against the tobacco industry on its own behalf with respect to its own costs.

Avoiding the ruling of *State by Humphrey v. Philip Morris*, and relying on a statement made during a confidential meet-and-confer conference, the deputy commissioner found that Blue Cross had

created "expectations" that it would return the settlement proceeds to its subscribers. Although Blue Cross maintained that the tobacco litigation would "benefit" its subscribers, the fact that the lawsuit recovered its costs for subscribers does not make their cost-control and cost-recovery efforts a process for obtaining rebates for past premiums paid. Considering the legal determination that the tobacco litigation was a direct action by Blue Cross on its own behalf, the record does not support the deputy commissioner's conclusion that the nonprofit intended the litigation proceeds to go to its subscribers. Because the deputy commissioner's conclusion disregards the supreme court's holding in *State by Humphrey*, as well as parallel analysis and findings of the ALJ, it is affected by an error of law. *See* Minn. Stat. § 14.69(d) (providing for reversal of administrative decision "affected by other error of law").

## C. Practicability of Rebate Proposal

 The deputy commissioner concluded that relator's plan was not fair and equitable because it did not include at least a partial rebate. Specifically, he suggested in his memorandum that "[i]t would be fair and equitable for any Blue Cross plan to include a refund of some portion of the settlement to the groups who paid the higher premiums during the period [used to construct] the damages model." This conclusion is premised on his finding that Blue Cross "presented little persuasive ev-

**5.** Amici, a number of former Blue Cross subscribers, advise the court that *State by Humphrey* does not determine whether past subscribers are legally entitled to recover past premiums paid from the funds received by Blue Cross in the tobacco litigation. If the commissioner has identified no basis in law or fact to disapprove the Blue Cross plan, amici contends that the matter must be "referred back to the court * * * to determine the subscribers' common law claims." The deputy commissioner lent his support for this suggestion, rejecting the idea that the commissioner's approval process "preempts judicial authority to hear common law claims."

As amici suggest, *State by Humphrey* does not eliminate the prospect for an award of benefits to past subscribers. But it permits the insurer's recovery and contradicts the notion that this recovery must be viewed as one for the sake of past subscribers.

The common law claims of amici are the subject of *Blue Cross and Blue Shield Subscriber Litig.*, No. C5–98–1826, 1999 WL 203762 (Minn.App. Apr.13, 1999), *review denied* (Minn. June 29, 1999). We have no lawful occasion here to alter or enlarge the determination in that case or to otherwise address the merits of the common law claims or the availability of process to assert them.

idence that [a plan providing a premium refund] had been seriously considered" and "would be difficult and costly." The ALJ concluded that while Blue Cross could presumably have proposed a rebate program, which would likely be approved by the commissioner, Blue Cross had determined that a rebate was not the most appropriate, practical way to adjust its operations, and the Department of Commerce agreed.

The record reflects Blue Cross's thoughtful consideration and reasoned rejection of premium rebates. There is evidence that Blue Cross considered the significant administrative costs and burdens in connection with the: (a) complexity of developing a fair plan for all past subscribers; (b) potential of litigation challenging any rebate proposal and the resulting dissipation of settlement proceeds; and (c) difficulty of locating past subscribers from throughout the 20-year period covered by the tobacco litigation. The record also reflects that Blue Cross recognized the potential income tax consequences and absence of additional health benefits in considering a rebate plan proposal. The deputy commissioner adopted the ALJ's findings that subscribers will face higher premiums without Blue Cross's long-term health improvement initiatives and that numerous factors, in addition to Blue Cross's health care costs, affect premiums. Otherwise, the deputy commissioner struck or modified each finding regarding Blue Cross's consideration of and reasoned rejection of a rebate proposal.

The deputy commissioner's practicality determination could reflect his agency expertise, special knowledge, and training; it is therefore entitled to some judicial deference. But the decision on this question also involved findings of fact based on the evidence available. As such, we must also determine if the determination is supported by substantial evidence and whether it is arbitrary or capricious. *See Petition of Northern States Power Gas Util.,*

519 N.W.2d at 923–24 (presuming quasi-legislative administrative agency decisions are correct because they involve agency expertise and special knowledge in its field of technical training, education, and experience); *see also Orr,* 396 N.W.2d at 662 (requiring quasi-legislative decision to be supported by substantial evidence).

The deputy commissioner stated that a rebate plan would be fair and equitable and that Blue Cross did not present sufficient evidence that it considered a rebate proposal. The record does not support this determination. The deputy commissioner's failure to sufficiently articulate or support by substantial evidence his reasons to strike or modify the ALJ's findings regarding Blue Cross's consideration and rejection of rebates are an arbitrary part of his decision. *Orr,* 396 N.W.2d at 662 (holding that reasons for rejecting an ALJ's findings must be articulated and supported by the record).

### D. Valuation and Duplication of the Plan's Program

In his memorandum, the deputy commissioner contends that relator's plan is not fair and equitable to its subscribers because its programs have uncertain value and duplicate one another and existing tobacco cessation programs offered by Blue Cross and the State of Minnesota.

### 1. Valuation

#### a. Pharmacy Reserve and Risk Behavior Program

With regard to the pharmacy reserve, the deputy commissioner adopted the ALJ's findings that Blue Cross: (a) established the program to cover the expenses of adding coverage for tobacco-cessation drugs and treatments over the next twenty years; (b) developed the program model based on several assumptions regarding its benefit, Blue Cross's membership growth and demographics, and the costs and success rates of treatment methods and attempts to quit smoking; and (c) intends to

manage the duration of the reserve by subtracting the cost of its benefits and adding any credited interest. The deputy commissioner adopted each of these findings and does not specifically challenge the value of the pharmacy reserve program. The deputy adopted the ALJ's finding that cessation is the initial focus of the risk-behavior program, but struck the judge's findings regarding the multiple dimensions of this risk-elimination initiative and the evolution of the program as it focuses on different high-risk lifestyles over time. Although the deputy commissioner did not specifically address the valuation of the risk-behavior program, he found that Blue Cross intends the program to evolve over time and focus on prevention and treatment of individuals and communities in various settings, and that Blue Cross claims the program is based on scientific theory and supported by research.

### b. Member Health Awareness Program

 The deputy commissioner found that although the Member Health Awareness Program "proposes * * * a menu of options intended to improve [Blue Cross subscribers'] health and safety," it "does not specify what options will be offered." He also found that Blue Cross's stated goal was to bring attention to and empower individuals to control their own health, but that the program may be changed at any time and has "no concrete commitment to a specific process or set of goals." In his memorandum, the deputy commissioner suggests the program "lacks any real substance," but only suggests that the success and value of the program depends on the sustained commitment of individual subscribers. The deputy commissioner struck the ALJ's findings in this regard without additional reasoning or evidentiary support.

The deputy commissioner contends that it is pure speculation to assume that providing "brochures, * * * cookbooks, or vegetable steamers" will gain subscribers'

attention or empower them to become healthier. But his conclusion that the program is not committed to a "specific process or set of goals" ignores the fact that former Commerce Commissioner Gruenes explicitly requested including a member health awareness program to provide immediate and tangible benefits to subscribers. Although the deputy commissioner complains that Blue Cross has "the discretion to change the program at any time," the amended consent order requires Blue Cross to submit its proposed spending plans to the commissioner, who has the ultimate, unappealable authority to approve or disapprove any outline for spending and to conduct independent analysis of the financial accounting and effectiveness of the program. Also, relying on the written testimony of two professional actuaries, the deputy commissioner concluded that the program has questionable value because "Blue Cross does not anticipate any long-term savings from th[e] program." But testimony of the actuaries only stated that their calculations of anticipated savings from the plan's programs "d[id] not assume any savings from the $80 million that Blue Cross intends to spend on its Member Health Awareness Program." The prospect for savings was not denied in the record.

The record is replete with evidence of Blue Cross's efforts, prospectively under the amended consent order's regulatory and supervisory framework, to ensure that the planned programs are effective and expenditures are warranted. There is evidence that Blue Cross intends to work with health care providers and designed its plan to provide maximum flexibility to address the changing clinical climate, adapt to program evaluations, and add health care improvements. Blue Cross also organized a scientific council to advise it on appropriate expenditures and specific programs, which are also subject to commissioner review and approval under the amended consent order. In addition, the record reflects Blue Cross's creation of the

Center for Tobacco Reduction and Health Improvement, which will report directly to Blue Cross's chief medical officer, and accounting policy and procedures to ensure the tobacco settlement proceeds are used appropriately. The deputy commissioner's disparagement of the program in findings of fact is not supported by ·substantial evidence. The absence of evidentiary support or articulated reasons for rejecting the ALJ's findings, as well as the agency's own inducement of the member health awareness program, renders those choices arbitrary. *See Orr*, 396 N.W.2d at 662.

## 2. Duplication

█ The deputy commissioner also suggested that relator's plan was not fair and equitable because the member health awareness and the risk-behavior programs are duplicative of one another and may duplicate programs and services already offered by Blue Cross. He suggested that the programs are duplicative because each addresses the benefits of physical activity, exercise, and nutrition. His conclusion that the programs duplicate other programs already existing through Blue Cross is premised on the wealth of information in Blue Cross's Health Journal for Spring 1999 and on its web sites addressing similar health concerns as the programs. Blue Cross's Journal and web sites are not part of the record and the deputy commissioner provides no other evidentiary support for his conclusions.

The record demonstrates that the member health awareness program was added to the plan· at the Department of Commerce's request to provide immediate tangible benefits to Blue Cross subscribers and was designed to operate over the first 30 months of the plan's existence. In contrast, the evidence shows that the risk-behavior program is initially focused on tobacco cessation and extends over the duration of the plan. Without explanation or supportive evidence, the deputy commissioner struck the ALJ's findings regarding the time limitation of the member

health awareness program and adopted the finding that the risk-behavior program is initially focused on tobacco cessation. Because neither the record nor his own findings provide support, his conclusion that the programs are duplicative is arbitrary support for the conclusion that relator's plan is unfair to its subscribers. *See Orr*, 396 N.W.2d at 662.

In addition, the deputy commissioner contends the pharmacy reserve and the risk-behavior program duplicate other state tobacco-use-cessation programs. The deputy commissioner specifically mentioned that the Minnesota Partnership for Action Against Tobacco (MPAAT) already administers $202 million to provide smoking-cessation opportunities to Minnesotans and research grants for projects aimed at eliminating childhood tobacco use. He also noted the 1999 Minnesota Legislature's appropriation of $968 million of the first $1.3 billion of the state's tobacco settlement proceeds to fund an endowment committed to tobacco cessation and prevention and another aimed at funding clinical training for medical professionals involved in treating tobacco-use-cessation patients. While commending the objectives of the plan's programs, the deputy commissioner suggested that Blue Cross contribute money to existing programs rather than spending it on the startup and administration costs of its own new organizations and programs.

The record reflects Blue Cross's effort to establish procedures and organizations to ensure the appropriate use of settlement dollars and to avoid unnecessary duplication of existing programs. In striking most of the findings on these practices and procedures, the deputy commissioner noted that some Blue Cross personnel responsible for the implementation of the plan also serve on MPAAT or Blue Cross's internal organizations protecting against duplication. But this interconnectedness does not demonstrate that the programs duplicate one another or existing programs. Moreover, nothing in the record

addresses the value of other tobacco cessation efforts or the value of contributions to those programs by Blue Cross. In sum, the deputy commissioner's conclusion that the programs lack value or are duplicative is based on speculation, not supported by the record or his own findings, or ignores the reporting mandates and the commissioner's supervisory and regulatory authority under the amended consent order.

## IV.

### *Other Issues of Substance*

*A. Control*

 In the amended consent order, the Department of Commerce agreed that relator's plan meets the applicable statutory obligations and mandates, including compliance with the statutory limits of Minn. Stat. § 62C.09, within a reasonable time. In the amended consent order, Blue Cross, HealthPartners, and the department agreed that the plan adjusted Blue Cross's operations to correct its excess surplus condition within a reasonable time. In concluding that the plan resolved the excess surplus condition within a reasonable time, the ALJ found that relator's excess surplus would disappear by 2005 under its original proposed plan, that an October 1998 supplement to the plan, accelerating $80 million in spending, eliminated "any potential excess surplus," and that the final plan, under the January 1999 amended consent order, anticipated an excess surplus that "would be eliminated if Blue Cross incurs an additional tax liability of $49 million."

This administrative finding was adopted by the deputy commissioner. But he nevertheless concluded that relator's plan failed to correct the excess surplus within a reasonable time, reasoning that the "money used to fund these new programs * * * will still be under Blue Cross' control" and "merely designating [excess surplus] as the funding source for new programs [in Blue Cross's plan] does not [reduce or eliminate] its excess surplus".

No correction is achieved, the deputy commissioner concluded, even though the funds to create new programs are "technically segregated from [relator's] operating reserves and allowable surplus [under] the amended consent order." Based on this analysis, the deputy commissioner measured the surplus-correction time of the Blue Cross plan by considering the duration of programs funded by segregated funds rather than the creation of the funds themselves.

By statute, the commissioner has regulatory oversight and control of relator's use of the surplus monies. *See* Minn.Stat. §§ 62C.15, subds. 2 and 4 (giving the commissioner approval oversight over Blue Cross subscription charges and contracts), 62J.041, subd. 4(a) (1998) (authorizing Commissioner to "monitor health plan company reserves and net worth as established under chapters 60A, 62C"). Moreover, the amended consent order gives the Department of Commerce the ability to review the nonprofit's actual expenditures of the settlement proceeds and authorizes the department to order the necessary changes to accomplish the plan's objectives and comply with the statutory obligations and regulatory mandate. In addition, the order gives the commissioner the exclusive authority to: (1) seek relief or sanctions if Blue Cross violates any of the provisions, reporting requirements, or obligations of the Order, and (2) require Blue Cross to supplement its plan if, in the commissioner's discretion, the approved plan has failed to meet its intended goals. Because the deputy commissioner's conclusion ignores the commissioner's authority to govern relator's use of the surplus monies—authority established by statute and consummated by the consent order—his conclusion that continued control of the funds does not discharge the nonprofit's obligation to remedy its excess surplus within a reasonable time is arbitrary and affected by an error of law.

Supporting this erroneous analysis of the deputy commissioner, the respondent

commissioner argues on appeal that the segregation of funds in relator's plan does not create liabilities that reduce the non-profit's surplus. This argument was not advanced by the deputy commissioner, it is contradicted by agency testimony on the accounting practices of the Department of Commerce, and no other evidence in the record addresses the topic. A nonprofit provider, respondent states on appeal, must maintain reserves, constituting liabilities, for designated accrued liabilities that reflect its contractual obligations to subscribers. The commissioner erroneously suggests that this propriety of reserves or similarly segregated funds does not extend to those created in the Blue Cross plan. Because the statutes contain no prohibitory provisions in respect to closely-regulated program reserves created from surplus, the commissioner's argument introduces another error of law into the deputy commissioner's rationale.

In the amended consent order, the department recognized that the proposed programs, particularly the Tobacco Cessation Pharmacy Reserve, are liabilities for statutory accounting purposes. Because liabilities reduce surplus under standard, undisputed accounting practices, the segregation of funds under the plan must also reduce Blue Cross's excess surplus. Minn. Stat. § 62C.01, subd. 2, requires the computation of reserves and surplus to follow "reasonable and practical standards." The department's testimony that reserves are commonly employed, even as charges against current income in some circumstances, is consistent with standard accounting principles. *See, e.g.,* Financial Accounting Standards Board, FASB ¶ 8 (1999) (recognizing loss contingencies as charges against income); National Ass'n of Ins. Commissioners, *Accounting Practices & Procedures Manual,* Statement of Statutory Accounting Principles No. 5 ¶ 7 (1999) (effective January 1, 2001) (same).

Neither the deputy commissioner's view nor arguments advanced for it on appeal are supported by substantial evidence. Moreover, by disregarding the agency's expertise and experience, the deputy commissioner arbitrarily reaches the conclusion that relator's plan does not correct its excess-surplus condition. *See Orr,* 396 N.W.2d at 662. And the deputy commissioner's conclusion that relator's continued control of the reserves did not correct the excess-surplus condition is not entitled to deference because it does not disclose expertise or special knowledge other than the stance first taken by agency experts. *See Reserve Mining Co.,* 256 N.W.2d at 824 (granting deference and presumption of correctness only when decision involves agency's expertise).

In sum, the deputy commissioner has erred in determining the non-compliance of relator's plan with Minn.Stat. § 62C.09, inexplicably denying the effect of planned segregation of funds to eliminate funds from the operational control of Blue Cross.

### B. Market Impact

■ Relator disputes the deputy commissioner's conclusion that its plan would adversely impact the health insurance market in Minnesota, contending that this judgment was improperly based on the public comments submitted by Attorney General Mike Hatch, the Minnesota Chamber of Commerce, and the Department of Health. Attorney General Hatch commented that the Blue Cross plan is simply to expend funds in the form of "public relations" items, which are designed to enhance Blue Cross marketing and which "could possibly" upset the balance of HMO competition in Minnesota. Confident that Blue Cross would use its reserves as a device to gain business, the attorney general opined that the plan "will unduly disrupt a marketplace that is already highly concentrated" and has "a potential to disrupt the remaining market players." [6]

---

**6.** The attorney general also submitted comments disputing the sufficiency of reserves

or other segregated funds to reduce surplus. Like the deputy commissioner, he suggests

The Minnesota Department of Health stated that "[a]llowing BCBSM to use this money to gain an unfair advantage in the marketplace will further destabilize health care in Minnesota." Although the health department letter did not come before the ALJ and thus was not addressed in his findings of fact, the deputy commissioner relied on the department's concern that the allocation of tobacco settlement proceeds to Blue Cross would give them a competitive advantage, making it even more difficult for new market entrants to succeed in rural Minnesota communities.[7]

Although these disputed comments speculate about possible market consequences, the record demonstrates that relator's plan was not intended or developed to improve its market share. First, the January 1999 amended consent order grants the Commissioner of Commerce the continuing authority to oversee Blue Cross's use of the settlement proceeds and to regulate Blue Cross's operations to prevent adverse market impact. Second, Department of Commerce experts felt the plan adequately addressed market-impact concerns. Finally,

HealthPartners, one of relator's major competitors, withdrew its market-impact objection and pre-filed testimony because it believed the amended consent order appropriately addressed market-impact concerns.

The record supports the ALJ's findings and conclusion that the Blue Cross plan would not adversely affect the health insurance market in Minnesota, and the deputy commissioner failed to articulate the reasons or identify substantial evidence to support his contrary conclusion. *See Orr*, 396 N.W.2d at 662 (recognizing as "evidence of an arbitrary decision" the failure to explain the reasons for deviating from an ALJ's findings). Instead, he struck the ALJ's findings of fact regarding market impact and relied solely on the speculative comments submitted by the health department, the attorney general, and the Minnesota Chamber of Commerce for his finding that the Blue Cross plan was likely to have an adverse impact on the regulation and orderly operation of the insurance industry in Minnesota. Although the dep-

---

that surplus will not be reduced until actual program expenditures occur, thus unreasonably delaying reduction of the surplus. The attorney general speculates that funds like these could be employed by insurers to avoid income tax, and that income tax authorities could be expected to repeatedly initiate claims on the money kept in segregated funds. Underlying these comments is the attorney general's characterization of funds created under relator's plan, describing them as reserves for future obligations "which are neither contracted nor obligated under the law." As stated in the analysis of this issue earlier in this opinion, this incorrectly depicts the funds in question, the expenditure of which must be in accord with the amended consent order and is unconditionally controlled by the Commissioner of Commerce. The attorney general contends that the planned Blue Cross reserves are contrary to standards of the Society of Certified Public Accountants and the American Society of Actuaries, but no specific analysis of these authorities is given in his comments or elsewhere in the record; the deputy commissioner acted without reference to either authority.

In addition, like the deputy commissioner some months later, the attorney general faulted relator's plan because it failed to provide rebates to past subscribers – a group, the attorney general emphasized, that includes local government bodies that might make valuable use of rebates. This opinion has analyzed the deputy commissioner's later rationale for this policy view, finding it affected by an error of law, unsupported by substantial evidence, and arbitrary in its disregard for evidence given by agency experts and findings of fact submitted by the ALJ. The attorney general asserts a consistent prior practice by nonprofit insurers to rebate excess funds, but the record includes no evidence of such occurrences.

7. On appeal, the commissioner explained that the deputy commissioner "inadvertently" considered the Minnesota Department of Health's comment addressing concerns regarding Blue Cross's dominant market position in rural Minnesota. Although the deputy commissioner believed the department's letter was a public comment, the letter was not part of the record and was never considered by the ALJ because it was addressed directly to the deputy commissioner.

uty commissioner was entitled to consider the public comments of the attorney general and the Chamber of Commerce, those comments cannot substitute for the other, uncontradicted evidence of record and serve as the sole basis for his conclusion.

### C. Public Interest

The ALJ found that relator's plan serves the public interest because it involves valuable research initiatives on addictive behaviors as well as programs that will promote improved health and contribute new health care information and techniques to benefit the public as a whole. Because the plan describes an effort to work through physician groups to implement the best practices to promote improved health and lower claims, the ALJ found that health care costs will be lowered and all insurers will be able to offer lower premiums. Additionally, the judge discussed the importance of the fact that the Department of Commerce had made a careful and concentrated effort to ensure that the proposed plan was consistent with law and public interest and revise the plan to benefit the public and Blue Cross subscribers. He also noted the number of public comments in support of the plan.

Although the deputy commissioner recognized its benefits, he concluded that the Blue Cross plan is not in the public interest because it: (a) does not comply with Minn.Stat. ch. 62C and Blue Cross cannot be allowed to creatively reinterpret the statute's surplus-corridor provision; (b) squanders money on duplicative programs; and (c) may disrupt the highly competitive and highly concentrated health insurance market. Without explanation, the deputy commissioner struck four of the six findings of fact regarding the public interest criteria. Although the deputy commissioner adopted the finding that "[t]he department is satisfied that Blue Cross's plan is in the public interest," he inconsistently added that, "as amended, [the plan] is not in the public interest."

In sum, the deputy commissioner's conclusion that the plan is not in the public interest is exclusively premised on his conclusions on the first three criteria addressed at the contested case hearing. Because we conclude that the deputy commissioner's conclusions with regard to each of those issues were either unsupported by substantial evidence, arbitrary, or affected by errors of law, we cannot affirm his decision that the plan was not in the public interest of Minnesota citizens. Moreover, the deputy commissioner failed to articulate his reasons or provide evidentiary support for his decision to strike the ALJ's findings that the plan is in the public interest. See Orr, 396 N.W.2d at 662 (citing evident arbitrariness of deviation from ALJ findings without identification of reasons).

### DECISION

In all of its dispositive parts, the commissioner's disapproval decision is either affected by errors of law, not supported by substantial evidence, or is arbitrary and capricious. Consequently, the commissioner improperly disapproved relator's plan to correct its excess-surplus condition. Because the record manifestly supports approval of the plan, signaled by the evaluation and negotiated consent of the commerce department, the case is remanded for implementation of the January 1999 amended consent order, in which is found the final amended form of the plan.

Reversed and remanded.